## VANCE, et al. v. ARNOLD, et al.

No. 7058.   Decided January 11, 1949.   (201 P. 2d 475.)

Rehearing Denied February 28, 1949.

See 17 C. J. S., Contracts, sec. 327; 12 Am. Jur. 772. Extrinsic evidence of custom or usage to show terms in a construction contract have a special trade significance, note, 89 A. L. R. 1247.

*Rich, Rich & Strong,* of Salt Lake City, for appellants.

*Critchlow & Critchlow,* of Salt Lake City, for respondents.

LATIMER, Justice.

In detailing the facts of this controversy, we do not intend to convey the impression that all were uncontroverted. Very few are important to this decision and in those instances where they were disputed, we have adopted the findings of the trial judge. All of his findings are supported by substantial evidence.

On the 6th day of November, 1944, defendants entered into a contract with the United States of America for the construction of an automatic sprinkler system in certain warehouse buildings at the Utah Army Service Depot near Ogden, Utah. Defendants' contract price was arrived at, in part, by a compilation of bids submitted by subcontractors. Plaintiffs were electrical contractors doing business in Salt Lake City, Utah, and submitted a bid for the electrical installation. Prior to submitting their bid, plaintiffs had received copies of the plans and specifications for the installation and after computing the costs and expenses involved in the electrical work, they submitted a bid to defendants wherein they agreed to do the electrical work for the sum of $14,500.

Upon being awarded the job by the government, defendants discussed the electrical subcontract bid with plaintiffs and notified them that they, defendants, had received bids for considerably less than the $14,500 bid by plaintiffs. Based on this information, plaintiffs apparently reduced their bid to the sum of $10,000 and subsequently met with defendants to further discuss the details of the job. At the time the electrical subcontract was computed, plaintiffs

were uncertain as to whether or not the low pressure alarm system was to be installed as part of the electrical work. This matter, however, was the subject of a later discussion with the defendants.

On or about the 15th day of November, 1944, plaintiff, Kimball Vance, and his estimator met with the defendants and discussed the extent of the electrical work included in plaintiffs' bid. When the defendants were informed of plaintiffs' uncertainty in connection with the installation of the low pressure alarm system and were further informed by the plaintiffs that the revised bid of $10,000 did not include this low pressure alarm system, defendants refused to award plaintiffs the subcontract for the electrical work. Plaintiff Kimball Vance then discussed the matter further with his estimator and notified the defendants he would accept the subcontract, including the installation of the low pressure alarm system if required by the government, for the increased sum of $10,700. After receiving this assurance, defendants then executed a purchase order for the subcontract in the following words and figures:

"We are awarding you the Sub-Contract for furnishing all material and labor required for the Electrical work under the plans and specifications of Contract 2-04-167-Eng-688 in amount of Ten Thousand Seven Hundred Dollars, (10,700.00). Parties to this agreement understand fully the following conditions:

"1. Viking-Eichholz are to furnish in place the Five Horse Power Motors to operate the Air Compressor units. Vance Electric Service are to furnish the labor and materials for all wiring and controls for the Air Compressors and Motors.

"2. All work and material is to be subject to the inspection and approval of the Engineer in Charge of Construction and (or) his representative.

"3. Final payment will be made after receipt of approval in writing from the Engineer in Charge of Construction.

"We extend for your use for execution of this Sub-Contract the following. The material has a value of $6895.00.

"Preference Rating AA-3

"Allotment No. or Symbol W-6

"The undersigned purchaser certifies, subject to the penalties of section 35(a) of the United States Criminal Code, to the seller and to

the War Production Board, that, to the best of his knowledge and belief, the undersigned is authorized under applicable War Production Board regulations or orders to place this delivery order, to receive the item(s) ordered, for the purpose for which ordered and to use any preference rating or allotment number or symbol which the undersigned has placed.

> "Viking-Eichholz
> "R. B. Bean
> "Signature of Authorized Official."

In order to obtain the necessary preference rating on the materials necessary for the electrical installation, defendants requested that plaintiffs furnish them with a break down of the materials to be used. On November 15, 1944, this information was furnished by plaintiffs and included in the list was certain of the materials necessary for installation of the low pressure electric alarm system. The total cost of the materials itemized by plaintiff was $6,-895.00, and this is the figure shown in defendants' purchase order quoted above.

Plaintiffs commenced work pursuant to the terms of the purchase order and completed all of the specified work except the installation of the low pressure alarm system. On November 21, 1945, defendants, by written communication, notified plaintiffs that because of their refusal to install the low pressure alarm system, this portion of the job would be awarded to another bidder and the costs of this installation charged against the amount due the plaintiffs.

The importance of this system is unquestioned. Its purpose is to sound a warning when the air pressure in the system is reduced to such a point that any further reduction might permit the water to start flowing through the sprinklers with resultant water damage to all stored property.

On November 24, 1945, the plaintiffs answered defendants' communication of November 21, 1945, by the following letter:

"This will acknowledge receipt of your letter of November 21st with reference to the above captioned matter.

"Please be advised that we consider our sub-contract agreement with you as fully performed and executed on our part. The provision of the contract to which you refer does not require any electric alarm devices or circuits whatsoever, and in view of provision 1-A-02 (c) electric alarm circuits were no part of our work. This subdivision is a part of the special provisions of the specifications which provide that they shall govern over the drawings and all specifications covering the work.

"It is our position and always has been our position that under the plans and specifications the alarm devices, bells and circuits were no part of our work, and we can, therefore, assume no responsibility for such work. However, in order to avoid any delay or misunderstanding, and to permit each party to preserve and protect his own rights with particular reference to the interpretation of the specifications, we are willing to proceed with the installation of these alarm devices under the following conditions, to wit:

"We expressly reserve the right to claim additional compensation for labor and materials furnished and services performed in connection with the installation of the alarm devices including the right to institute legal proceedings to recover therefor. In the event that our interpretation of the specifications is upheld as a result of legal proceedings, you will then pay us the cost of labor and materials plus 10% profit and 5% overhead for the installation of the alarm devices, plus interest computed at the rate of 6% per annum of said sum from the date of completion of said work. However, in the event that our interpretation of the specifications is rejected as a result of legal proceedings, these devices will be installed at no additional cost to you.

"If you desire us to proceed on this basis kindly advise us in writing of your acceptance of our proposition."

On November 26, 1945, defendants acknowledged receipt of plaintiffs' letter, accepted the proposition submitted therein, and requested the plaintiffs to proceed forthwith.

The trial of the action came on for hearing before the District Court of the Third Judicial District, in and for Salt Lake County, and after hearing the evidence of the parties, the trial judge made findings of fact and conclusions of law favorable to the defendants and entered judgment in favor of the plaintiffs for the sum of $424.41, ad-

mittedly due to the plaintiffs for certain extra work not directly involved in this litigation. As a conclusion of law, the trial court found that the plans and specifications of the contract required the installation of the low pressure electric alarm circuits by the defendants and that plaintiffs were obligated to install this system without additional remuneration.

Plaintiffs appeal from the judgment as entered and while they assign 19 specifications of errors, these can be grouped under two principal contentions. First, that the trial court erred when it permitted introduction of incompetent parol evidence concerning the acts, conduct and statements of the parties preceding and co-existent with the execution of the written contract; and, second, that the trial court should have found as a conclusion of law that the low pressure alarm system was not part of plaintiff's work because of not being included in the plans and specifications.

While the trial court found that plaintiffs had orally agreed to install the low pressure electric alarm system, regardless of the interpretation of the plans and specifications, we need not consider the assignment of error on this ground in view of our holding that installation of the system was included within the terms and conditions of the plans and specifications. Neither need we concern ourselves with those specific assignments of error dealing with parol evidence for the reason that the reception of this evidence was immaterial if the plans and specifications required plaintiffs to install this system.

In inviting bids for this installation, the United States Government furnished each bidder with copies of the plans and specifications. It is admitted that both plaintiffs and defendants had the use of these. In view of the claimed discrepancy, it is necessary to interpret the provisions of the plans and the specifications dealing with the low pressure alarm system. The specifications are contained in one volume and can appropriately be divided into general

specifications, special provisions and letters of modification. There are three sheets of plans which are material insofar as this action is concerned. On sheet No. one, we find three separate references to the low pressure electric alarm system. These are as follows: (1) A note, "low pressure alarm system, set at 25 p. s. i. shall be installed for each dry pipe valve;" (2) a note, "see drawing U. G. 75-3 for electrical hook-up;" and (3) a detail of valve chamber installation showing location and identification of low pressure alarm. On sheet two, which is the schematic layout of the valve house, there appears the following note:

"Contractor to install water gongs and low pressure alarm system."

On sheet three of the plans, which is the electrical layout, there appears a diagram showing the electrical circuits, the location of the pressure switch, and the notation "Low pressure alarm bell inside building (set for 25 lb. air pressure)," with an arrow running from the notation to the bell.

There is no doubt that if the plans were considered to be controlling, the plaintiffs were required to install the low pressure alarm system. Plaintiff, Kimball Vance, conceded that at the trial and does not contend to the contrary in this court.

Passing to the general specifications, we are required to interpret three subparagraphs, two of which might appear to be inconsistent. Paragraph 24-01 of these specifications is as follows:

"24-01. *General.* The contractor shall furnish all labor, materials, and equipment and perform all operations necessary for the installation of automatic sprinkler systems in certain buildings and enclosed walkways designated in the SPECIAL PROVISIONS, in accordance with the drawings and these specifications."

This general provision places on the defendants the responsibility of completely installing the automatic sprinkler system, in accordance with the drawings previously referred to and the specifications hereinafter quoted.

Section 24-03 b (6) of the general provisions is as follows:

"(6) *Alarm Valves*. Alarm valves shall be of the latest design of any manufacturer listed by the Underwriters' Laboratories, Inc., or other nationally recognized testing laboratories, and shall be suited for the purpose intended. Valves shall be of the same size as the riser and shall be of a variable pressure type, designed to prevent false alarms due to water hammer or other pressure surges. *Electric alarm circuit switches shall be provided. Water motor alarms are not required*. Alarm valves shall be equipped with standard fittings and accessories, such as gages and retarding chambers."

Prior to the time plaintiffs computed their bid, the government, by a letter addendum, deleted from this subparagraph the two italicized sentences, so that this paragraph, as amended, makes no mention of electric alarm circuit switches. It is one of plaintiffs' contentions that by deleting these two sentences the general specifications do not require the installation of the low pressure alarm system. Defendants, in opposition to this, contend that this subparagraph has to do with the wet system, whereas the installation is concededly a dry pipe system. While we lean towards defendants' contention, it is not necessary for us to decide this point. The deletion of these two sentences may make some difference in the requirements imposed by this paragraph, but it does not change or alter the provisions of the next quoted paragraph. The most that can be contended for the deletion is that subparagraph 24-03 b (6) no longer deals with the necessity of installing the electric alarm circuit switches.

Paragraph 24-03 b (7) provides as follows:

"(7) Dry Pipe Valves. Dry pipe valves shall be of the latest design of any manufacturer listed by the Underwriters' Laboratories, Inc., or any other nationally recognized testing laboratories. Dry pipe valves shall be equipped to give a signal on operation of the system. *A low air pressure alarm shall be provided to operate a local bell at a pressure of five (5) pounds per square inch in excess of the static water pressure on the wet side of the valve.* Where dry pipe valves supply three hundred (300) or more heads, the valves shall be equipped with quick opening devices. The dry pipe valves shall

be equipped with standard trimmings, such as gages and priming chambers." (Italics ours.)

This paragraph specifically provides for the installation of the low pressure alarm system and with subparagraph 24-03 b (6) silent as to this requirement, it cannot be said that there is any inconsistency between the two. Neither is subparagraph (7) hostile to any other provision of the general specifications. On the contrary, it is entirely consistent with all other general specifications and with the plans hereinbefore referred to and the notations contained therein.

The next contention made by plaintiffs involves the interpretation of certain special provisions. Those provisions, having a bearing on the question involved, are as follows:

*"Section 1a—Special Provisions*

"These special provisions describe and cover the particular work set forth herein. *In case of discrepancy the Special Provisions shall govern over the drawings and all specifications covering this work.*

"1A-02. *Work to be done* consists of furnishing all necessary plant, labor, equipment and materials (except materials and equipment specified to be furnished by the Government) and constructing therewith Automatic Sprinkler Systems for Warehouses 8D, 9A to 16A, inclusive, and Buildings No. 256 and No. 266, *in accordance with the drawings listed in Paragraph 1A-03 hereof and with these specifications.*

"(b) *Type of Systems.* The automatic sprinkler systems shall be the dry pipe type, as specified in the Section on AUTOMATIC SPRINKLER SYSTEMS.

"(c) *Electrical Alarm Circuits are not a part of this work.* The contractor shall provide plugged tees for installation of supervisory control switches, which will be installed by others.

"1A-03. Drawings.

"(a) *The work shall conform to the following drawings,* which form a part of these specifications, and are filed in the U. S. Engineer Office, Wright Building, 1209 Eighth Street, Sacramento, California. In case of conflict between the specifications and the detailed drawings, the specifications will govern.

"List of Drawings

| File No. | Sheet No. | Designation |
|----------|-----------|-------------|
| UG 75-3 | Sht. 1, Sht. 2, Sht. 3, Sht. 4, | Automatic Sprinkler Systems. |
| UG 75-4 | Sht. 1, Sht. 2, Sht. 3 | Automatic Sprinkler Systems." |

If there is any conflict in the special provisions, it arises by virtue of the fact that the provisions of subsection 1A-02 (c) appear to eliminate certain circuits which are required by the provisions of sections 1A-02 and 1A-03. Subsection (c) might be interpreted in one of two ways. If the first sentence is torn from its context and interpreted to apply to all electric alarm circuits, then it would be inconsistent with the plans, with the general specifications previously referred to, and with other quoted special provisions. In addition, it might destroy the successful operation of the sprinkling system and eliminate from the contract one of the most important parts of the warning system. If the paragraph is considered as a whole, then it deals only with the installation of what is referred to as the A. D. T. circuits and any inconsistency and ambiguity between the plans, specifications and provisions is removed.

We conceive it our duty in interpreting the plans, specifications and provisions which form part of this contract to reconcile the provisions, if reasonably possible, so as to give effect to all, and to construe the complete contract to carry out its dominant purpose. If two interpretations are possible, one which would lead to confusion, uncertainty or elimination of one of the essential parts of the contract, and one which would harmonize all provisions of the writings and make the contract complete, fair and usual, the latter interpretation should be preferred.

It is obvious that if we take the first sentence, "electrical alarm circuits are not a part of this work" out of the paragraph and hold that it applies to the low pressure alarm system, we eliminate from the contract a very vital part of the warning system. One of the most important alarm signals is not required, and the safety feature to protect the supplies and equipment from water damage is not considered part of the installation. It is conceivable that some other contractor might later make this installation, but we have grave doubts that it was intended by the parties to eliminate a very vital part

of the warning system with an expectation that it might or could be later installed. Reasonably prudent men would not likely plan the construction of a very expensive installation and eliminate an integral part of its workings, intending to have another subcontractor install the missing system at a later date and at additional cost.

If we do not separately consider each sentence but treat the paragraph as a whole, we find the second sentence of the paragraph dealing with an electrical alarm system, one not shown on the plans and one that was to be installed by others. This second sentence of the paragraph provides that the contractor shall provide plugged tees for installation of supervisory control switches, which will be installed by others. This sentence refers to what is designated as the A.D.T. system. This was an electrical alarm system that was to be later installed by a company that was specialized in that particular type of installation. The purpose of that system was to inform the control station personnel the location of the unit that was in operation. Our understanding of the system is that a plugged tee is installed on the dry side of the line. When the wires are run to complete the system, a supervisory switch can be placed at the position of the tee. If the water system is called into operation and the valve opens and permits the water to flow through the dry side, the flow or pressure of the water operates the supervisory control switch. A code system is used to indicate the location of the various valves installed in the system, and as the circuit is activated, the identifying code is relayed to the control fire station.

The A.D.T. or supervisory electric alarm system was not to be considered part of the contract, except to the extent that plugged tees were to be installed by the electrical subcontractor. The installation of the tees was necessary so that when the A.D.T. system was subsequently put in, the outlets or openings would be available. It seems to logically follow that because part of the work was called for in the plans and specifications, to remove any doubt as to the

balance of the work, installation of the rest of the system was excluded by the first sentence of the paragraph. There was a reason for mentioning the fact that this circuit would not be considered part of the work, even though the plans made no reference to this alarm circuit. Provisions were in the specifications requiring work to be done in preparation for its later installation, and so to avoid confusion it was consistent to provide that that circuit need not be considered part of the work.

Appellants contend that to restrict the paragraph to the A.D.T. system would render the provision useless, as the supervisory system is not shown on the plans. However, the explanatory notes on the plans and the provisions in the specifications mention the installation of the supervisory control system, and specifically provide that the installation shall be by others. Having mentioned the system and having required the installation of plugged tees, it is not inconsistent to provide that the electrical circuits necessary to operate the supervisory control system are not to be considered part of the work.

In this instance we have a half-million dollar installation where successful operation depends on the installation of three alarm systems. The plans and specifications indicate that one, the supervisory control system, is to be installed by some one other than the parties to this litigation. The other two systems referred to in the plans and specifications are valuable to the successful operation of the sprinkling system, and there is not the slightest suggestion that either of these two systems is to be the subject of a separate contract.

If we were to adopt appellant's construction, we would give little consideration to ordinary business judgment for the reason that the following effects would result: A relatively cheap but very important part of an expensive installation is eliminated; the work and effort necessary to prepare detailed plans and specifications is done for naught; plans which are carefully and painstakingly drawn are of

no value because of a single sentence which is prepared at the same time the plans are drafted; and the warning system is impaired to the extent that all property stored by the government is subject to possible damage by water. It is hardly an answer to say that some one else could do it. Good judgment, common sense, and economy dictate that the sprinkler system together with warning devices, should be installed as a complete system within the 90-day period provided by the contract. There was a reason for permitting the A.D.T. to install its own system just as the telephone installation is separately provided for. However, we are unable to find any good reason for eliminating the low pressure alarm system from the other electrical work.

To construe the paragraph, as we believe the parties intended, would be to hold that both sentences in the paragraph were dealing with the same system, and that when the special provisions refer to electric alarm circuits in the same breath with knockout tees and supervisory control switches, that all referred to supervisory control circuits. To so hold appears to be more reasonable than to sustain appellants' contention which in effect makes a contract which is so unusual that reasonable men would not likely enter into any such agreement. In transactions such as this, the sanity of end and aim should at least be considered, and an interpretation which makes a rational and probable agreement ought to be preferred. Two sentences of the same paragraph should not be torn from context and one sentence applied to one system and the other enlarged to include two systems. If the last sentence is dealing only with the supervisory control system, then the first sentence would be limited to the same system. So construed, the requirements in the plans and specifications involving low pressure alarm circuits would be given force and effect.

We conclude that when the plans, specifications and special provisions are considered in their entirety, they

require the installation of the low pressure electric alarm system.

Plaintiffs allege two causes of action. We have dealt only with the second cause and have not concerned ourselves with discussing the other for the reason that all items included in the first cause, except the credit for $180.32 claimed by defendants, are disposed of by stipulation of counsel and our holding on the second cause. As to the $180.32 credit, there is substantial evidence to sustain the trial court's finding of fact and we, therefore, do not disturb that finding.

The judgment is affirmed. Costs to respondents.

WOLFE and McDONOUGH, JJ., concur.

PRATT, Chief Justice (dissenting).

The prevailing opinion fails to grasp the significance of the distinction between special provisions and specifications. It says that if the first sentence of 1A-02 (c) "is torn from its context" and interpreted to apply to all electric alarm circuits, then it would be inconsistent with the plans and general specifications. The very purpose of the special provisions is to synchronize inconsistencies by providing, as indicated in the following quotations that the special provisions shall govern when such inconsistencies arise. The reason for this is obvious. The specifications are *stock instructions* applicable to sprinkler systems of this type generally, and are applied to this particular project by processes of addenda, deletions, and special provisions. Thus these special provisions govern when an inconsistency between them and the general specifications develops. To try and interpret them so that they are not inconsistent is to ignore their language and purpose entirely. The following quotations illustrate these statements:

Introductory paragraph to Section 1A.

"These Special Provisions describe and cover the *particular work* set forth herein. *In case of discrepancy the Special Provisions shall*

*govern over the drawings and all specifications covering the work."* (Italics added.)

Subparagraph (a) of Special Provision 1A-03.

"In case of conflict between the specifications and the detailed drawings the specifications will govern."

This latter quotation is important, too, as it gives a method of syncronizing conflicts between drawings and general specifications. In other words, if specifications and drawings are in conflict, the specifications shall govern. If special provisions and specifications and/or drawings are in conflict, the special provisions shall govern. By entering into such a contract the parties agree that inconsistencies are to be ironed out by such method of preferences.

The following two extracts from letters written by the litigants, after the contract was entered into (the first from that of the plaintiffs and the second from that of the defendants), indicate the main issue between the parties as to the inclusion of the alarms in the terms of the subcontract:

(1) "We expressly reserve the right to claim additional compensation for labor and materials furnished and services performed in connection with the installation of the alarm devices including the right to institute legal proceedings to recover therefor. In the event that our interpretation of the specifications is upheld *as a result of legal proceedings* you will then pay us the cost of labor and materials plus 10% profit and 5% overhead for the installation of the alarm devices, plus interest computed at the rate of 6% per annum on said sum from the date of completion of said work, however, in the event that our interpretation of the specifications is rejected as a result of legal proceedings, these devices will be installed at no additional cost to you." (Italics added.)

(2) "We accept your proposition and desire that you proceed forthwith."

There is nothing complicated about the issue so drawn. The parties agree that if plaintiffs' work is already required by the contract, then plaintiffs cannot recover for that work as an extra, as there would be no consideration for such an

agreement. If that work is not already covered, then defendants agree to pay the stipulated price for the work as an extra. The issue is to be decided by "legal proceedings". We are now engaged in that decision.

A few words about the sprinkler system: It has two sides, a dry side and a wet side. The 40 pound air pressure on the dry side holds back an 80 pound water pressure on the wet side. This condition is maintained by the automatic air compressors which turn on when the air pressure drops to 30 pounds and turn off when it reaches 40 pounds. These compressors are electrically operated. Loss of air pressure is bound to arise by seepage, and the compressors overcome that loss. In case of fire a fusable link in the sprinkler head gives way, resulting in a rapid loss of pressure down to 20 pounds air pressure. At this point a valve is tripped and water rushes into the dry side of the system and is sprayed upon the fire. Part of the water passes through water gongs which constitute a fire alarm. There are certain supervisory control switches that carry an electrical signal to the central fire station giving the location of the fire. *Except for certain tees in that system* (see Par. 1A-02 (c) following) *the installation of this supervisory control system was not a part of the prime contract, or of the subcontract.* Naturally, in a sprinkler system of so many mechanical parts necessary to respond to the various air pressures, there is danger of a mechanical defect developing which would result in a spray of water without a fire, if some method of catching that defect were not provided. This is the subject of the controversy in this case: The low pressure alarm system which springs into action at 25 pounds of air pressure (5 pounds above the 20 at which a spray may be expected) and warns the maintenance men that repairs are in order. The issue involves the question of the deletion of these electric alarm circuits by Par. 1A-02(c) quoted later.

Plaintiffs' subcontract is introduced by the following award from the defendants: (the prevailing opinion calls this a "purchase order")

"We are awarding you the Sub-Contract for furnishing all material and labor required for the Electrical work under the plans and Specifications of Contract W-04-167-Eng-688, in amount of Ten Thousand Seven Hundred Dollars, ($10,700.00). Parties to this agreement understand fully the following conditions.

"1 Viking-Eichhelz are to furnish in place the Five Horse Power Motors to operate the Air Compressor units. Vance Electric Service are to furnish the labor and materials for all wiring and controls for the Air Compressors and Motors.

"2 All work and material is to be subject to the Inspection and approval of the Engineer in Charge of Construction and (or) his representative.

"3 Final payment will be made after receipt of approval in writing from the Engineer in Charge of Construction.

"We extend for your use for execution of this Sub-Contract the following. The material has a value of $6895.00.

"Preference Rating *AA-3*

"Allotment No. or Symbol *W-6*

"The undersigned purchaser certifies, subject to the penalties of Section 35(a) of the United States Criminal Code, [now 18 U. S. C. A. §§ 286, 287, 1001, 1022, 1023], to the seller and to the War Production Board, that, to the best of his knowledge and belief, the undersigned is authorized under applicable War Production Board regulations or order to place this delivery order, to receive the item(s) ordered, for the purpose for which ordered and to use any preference rating or allotment number or symbol which the undersigned has placed.

"Viking-Eichholtz

"R. B. Bean        /s/

"Signature of Authorized Official"

Contract No. W-04-167-Eng-688, to which reference is made in the award, is the prime contract between defendants as prime contractors and the United States Government. It is a Standard War Department Form No. 2 used for lump sum construction contracts, and includes, by reference, plans and specifications which are the foundation of the contract between defendants as prime contractors and plaintiffs as subcontractors. The reference to plans and specifications is interlined in Article 1 of the Form No. 2, as follows:

"Specification No. 977, dated 24 October 1944; Addendum No. 1, dated 25 October 1944; Addendum No. 2, dated 26 October 1944; Addendum No. 3, dated 27 October 1944; Schedule of Payments, Page (2-a); drawings as designated in Paragraph 1A-03 of said specifications, said drawings being on file in the U. S. Engineer Office, Wright Building, 1209-8th Street, Sacramento, California; and Letter Order No. W-04-167-Eng-688 dated 6 November 1944, all terms and conditions of said Letter Order are hereby merged in the [sic] superseded by this Formal Contract."

The Specification No. 977 with addenda etc., is in separate pamphlet form.

The following two *specifications* (stock instructions as I have indicated above) cover the general requirements for the inclusion of alarms of the type in question, in sprinkler systems generally such as this.

"Section 24-03.

"(b) Material.

"(6) *Alarm Valves.* Alarm valves shall be of the latest design of any manufacturer listed by the Underwriters' Laboratories, Inc., or other nationally recognized testing laboratories, and shall be suited for the purpose intended. Valves shall be of the same size as the riser and shall be of a variable pressure type, designed to prevent false alarms due to water hammer or other pressure surges. *Electric alarm circuit switches shall be provided. Water motors alarms are not required.* Alarm valves shall be equipped with standard fittings and accessories such as gages and retarding chambers." (Italics added.) (These italicized sentences deleted by Addendum No. 2.)

"(7) *Dry Pipe Valves.* Dry pipe valves shall be of the latest design of any manufacturer listed by the Underwriters' Laboratories, Inc., or any other nationally recognized testing laboratories. Dry pipe valves shall be equipped to give a signal on operation of the system. *A low air pressure alarm shall be provided to operate a local bell at a pressure of five (5) pounds per square inch in excess of the static water pressure on the west side of the valve.* Where dry pipe valves supply three hundred (300) or more heads, the valves shall be equipped with quick opening devices. The dry pipe valves shall be equipped with standard trimmings, such as gages and priming chambers." (Italics added.)

Addendum No. 2 to Specification No. 977 (a means of fitting the stock instructions (specifications) to the particu-

lar project) has this to say of specification 24-03 (b) (6):
(first above)

"(a) *Page 24-4, Subparagraph 24-03-(b) (6), Alarm Valves*. Lines 6 and 7 *delete* the following: [I italicize 'delete']
" 'Electric alarm circuit switches shall be provided. Water motor alarms are not required.'
"2. The foregoing modifications shall be inserted in the Specifications, and in addition a copy of this addendum shall be attached to and made a part of the Specifications submitted with bid." (See italicized sentences Sec. 24-03 (b) (6) quoted above.)

Special provision 1A-02 (c) (another method of fitting the stock instructions to this particular project) has this to say:

"(c) *Electrical Alarm Circuits* are not a part of this work. The Contractor shall provide plugged tees for installation of supervisory control switches, which will be installed by others."

*Special provision* 1A-03 provides that the work shall conform to certain drawings [They are in evidence before us]. Among these is one sheet (UG75-3 sheet 3) which shows that the low pressure alarm (see italicized sentence Spec. 24-03 (b) (7) is electrically operated. Subparagraph (a) of Special Provision 1A-03 provides:

"In case of conflict between the specifications and the detailed drawings the specifications will govern." (previously quoted.)

The *specifications* (stock instructions) however, have nothing to say as to the requirement of electrification of low pressure alarms as it was deleted as above. There is, then, no conflict between the *specifications* and the drawings.

From what has just been said I am justified in concluding that so far as *specifications* (as distinguished from *special provisions*) and drawings are concerned the low pressure alarms are to be electrically operated, in projects generally of this type, because included in the drawings.

What effect, then, does special provision 1A-02 (c) (quoted above) have on the situation? It conflicts with

the drawings. The introductory paragraph to 1A quoted above says it shall govern. But the defendants contend that it is limited to supervisory control switches mentioned in its second sentence which supervisory controls are to be installed by others, and are not a part of this contract. My reasons for disagreeing with this follow:

1A-02(c) is a subparagraph and a subtopic under 1A-02 which latter paragraph is the *special provision* designating "Work to be Done" under this contract. It reads:

"1A-02. *Work to be Done* consists of furnishing all necessary plant, labor, equipment and materials (excepting materials and equipment specified to be furnished by the Government) and constructing therewith Automatic Sprinkler Sytems for Warehouses 8D; 9A to 16A, inclusive, and Buildings No. 256 and No. 266, in accordance with the drawings listed in Paragraph 1A-03 hereof and with these specifications." (This is not to be confused with 1-02 a general specification as to work to be done. Special provisions have an "A" following the first numeral.)

There are several lettered subparagraphs under this paragraph 1A-02 such as "(a) Guards", "(f) Air Compressors", (g) Concrete", each descriptive of what the work under this contract includes or excludes. Subparagraph "c" (1A-02(c) above) says that electric alarm circuits are not a part of "this work". The expression "this work" refers to the "Work to be Done" under par. 1A-02 of this contract —the work specific as to this project and not general (or stock) as to all work of this type. It is a specific exclusion, from this particular project, of electric alarm circuits. This does not mean, however, that of necessity the low pressure alarms are not to be electrified. It simply means that so far as this contract is concerned these contractors are not obligated to do that work. (We are not concerned with why the Government may desire to give others this job. It is a very common thing to allot particular work—maybe on several projects to a particular contractor, although individually by project the work is not of very great magnitude). Substantiation of my conclusion as to the withdrawal of this item from these contractors is found in the

fact that as the circuits are not part of this work the electrical switches are not to be installed by these contractors either, so they are eliminated from specification 24-03(b) (6) by Addendum No. 2. (quoted above.)

This is a dry pipe system (1A-02(b)), the purpose of the low pressure alarm being of course, to catch unwarranted loss of air pressure and thus prevent the spraying of the contents of warehouses without necessity. Any deletions from the work contemplated then has reference to deletions from the general construction of a dry pipe system. If there is a difference as to a wet pipe system, it is not applicable here. This statement is made in view of some contention founded upon an alleged difference in alarms as between the two systems.

Defendants have called attention to two articles found in that part of the contract I have heretofore designated Form No. 2, as distinguished from the Specification No. 977. I quote the parts of Articles 2 and 15 to which they refer:

"Article 2. * * * In any case of discrepancy in the figures, drawings, or specifications the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save at his own risk and expense."

"Article 15. Disputes. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the contractor at his address shown herein. Within 30 days from said mailing the contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. * * *"

They also invite attention to the content of the following two paragraphs of the award, and also specification 1A-03(c) quoted:

The award:

"2. All work and material is to be subject to the Inspection and approval of the Engineer in Charge of Construction and (or) his representative."

"3. Final payment will be made after receipt of approval in writing from the Engineer in Charge of Construction."

1A-03 (c) :

"Prior to execution of the work, the contractor shall check all drawings and specifications and shall immediately report all errors, discrepancies, conflicts and omissions discovered therein to the contracting officer. All such errors, discrepancies, conflicts and omissions will be adjusted by the contracting officer. Any adjustment made by the contractor without prior approval, shall be at his own risk and the settlement of any complications arising from such adjustment shall be made by the contractor at his own expense, and to the satisfaction of the contracting officer."

These references have been cited on the theory that they in effect make the decision of the contracting officer final —I presume in the belief that if the plaintiffs failed to avail themselves of the administrative remedy afforded they cannot succeed in court against any ruling made by that contracting officer. Such contentions are founded upon a misconception of the purpose of those quotations. Articles 2 and 15 are not part of the contract between plaintiffs and defendants—they are not part of the pamphlet designated specification No. 977 upon which plaintiffs' bid was founded, nor is there any cross reference to them in the specifications or provisions of that pamphlet. They are administrative remedies applicable only between the Government and the prime contractors (defendants). Furthermore, were they applicable to the subcontract, they do not cover the present issue. (See: *Virginia Engineering Co., Inc.* v. *United States,* 101 Ct. Cl. 516, at pages 531, 532; *United States* v. *Lundstrom,* 9 Cir., 139 F. 2d 792, headnote 6; and *Callahan Const. Co. et al.* v. *United States,* 91 Ct. Cl. 538, at page 634, where the rule of giving preferences is recited. In the case of *United States* v. *Joseph A. Holpuch Co.,* 328 U. S. 234, 66

S. Ct. 1000, 90 L. Ed. 1192, an appeal provision is discussed which is not limited to questions of fact; and the contracting officer there applied the preference rule as between specifications and drawings.)

As to the paragraphs of the award quoted, the approval of the engineer is only as to the class of work done—good, bad or indifferent—and for fixing the time of payment. Those provisions cannot by any stretch of the imagination be treated as giving the engineer final determination of the meaning of the terms of the contract—a question of law. As to paragraph 1A-03 (c), it does not give the contracting officer final determination of the meaning of the terms of the contract, and has no different effect than that of Article 2 above. Furthermore, it merely says that if the contractor attempts to adjust matters himself, he does so at his peril. No such attempt is in issue in this case. The word "conflicts" in 1A-03 (c) refers to conflicts not clarified by the preference provisions of the special provisions.

To summarize my interpretation of the contract: As the *special provisions* of Specification No. 977 take precedence over plans and *specifications;* and as those *special provisions* withdraw from the work generally to be done under a prime contract, such as this, the electric alarm circuits, plaintiffs were not obligated to do this work as part of their contract. It was an extra. The fact the plans and *specifications* contemplate electrification of the low pressure alarms, as to this type of work generally does not mean that the obligation of installing such alarms is a part of this particular contract. As the subcontract, according to the award, is for all the electrical work under Specification No. 977, the subcontractors were under no obligation to do more than were the prime contractors. If the Government contracting officer ruled that this work was a part of the prime contract he committed error in his interpretation of the terms and it would not bind anyone. (The *Lundstrom* and *Callahan* cases cited above.)

I have cited these Court of Claims decisions, as that court spends a large part of its time interpreting the various provisions of Government contracts; and, as disclosed by their reports, follows rather closely the details of each contract. The United States Supreme Court decision I have cited is an appeal from the Court of Claims.

In view of the fact that this is a dissent, I will not discuss the other assignments of error. I am of the opinion that the judgment of the lower court should be reversed as to the electric alarms. As there is no ambiguity in the contract, parol evidence should not have been introduced in the case for any purpose other than to explain terms the meaning of which was a matter of expert knowledge.

WADE, Justice, concurs in the dissenting opinion of Mr. Chief Justice PRATT.