**BIG COTTONWOOD TANNER DITCH COMPANY, a corporation, Plaintiff and Appellant,**

v.

**SALT LAKE CITY, a municipal corporation, Defendant and Respondent.**

No. 860045–CA.

Court of Appeals of Utah.

Aug. 12, 1987.

Rehearing Denied Oct. 13, 1987.

James R. Brown, Jardine, Linebaugh, Brown & Dunn, Salt Lake City, for plaintiff and appellant.

Ray L. Montgomery, Asst. City Atty., Salt Lake City, for defendant and respondent.

Before BILLINGS, GARFF and JACKSON, JJ.

## OPINION

GARFF, Judge:

This is an appeal by Big Cottonwood Tanner Ditch Company (Company) from a declaratory judgment granted in favor of Salt Lake City (City) interpreting two agreements. The trial court found the City responsible for maintenance of the "mains," and the Company responsible for maintenance of the individual service lines and private lines from main to meter.

On January 2, 1920, the Company and the City entered into an agreement to exchange culinary and irrigation water and to provide for a pipeline system to distribute the culinary water. The agreement purported, among other things, to delineate responsibility for the maintenance and repair of the pipeline system between the parties. Several years later, disputes arose regarding these responsibilities. The Company filed a complaint against the City, resulting in the execution of a settlement agreement on July 27, 1965. This settlement agreement attempted to clarify the parties' respective responsibilities, and expressly "ratified, affirmed and declared to be in full force and effect" the 1920 agreement except as it was "specifically changed, modified or amended by the express terms of this agreement."

Under these agreements, the pipeline system consisted of three basic parts: 1) main lines (mains); 2) service lines and individual service lines extending from mains to meters located on the property lines of both Company shareholders and private non-shareholder owners; and 3) lines extending from meters to water users' homes.

On January 26, 1983, the City notified Mrs. Turpin, a Company shareholder, that she must pay the cost of repairs for her service line or the City would shut off her water pursuant to paragraph L of the 1965 agreement. She refused to pay, the City shut off her water, and the present action arose.

The Company contends that the 1965 agreement requires the City to maintain and operate, at its own cost, the entire pipeline system, not just the mains. The City interprets the two agreements to give it responsibility for maintaining the mains only, requiring the Company or its individual shareholders to repair the service lines.

We must determine what parts of the pipeline system are mains, what parts are service lines, and which party has responsibility for maintenance and repair of each of these parts of the system.

Since the "[i]nterpretation of a written contract is ordinarily a question of law, ... this Court need not defer to the trial court's construction, (citation omitted) but will make its own independent interpreta-

tion of the contract terms." *Jones v. Hinkle,* 611 P.2d 733, 735 (Utah 1980). *See also Bradshaw v. Burningham,* 671 P.2d 196, 198 (Utah 1983). We consider both agreements in determining the intent and obligations of the parties. "[W]here two or more instruments are executed by the same parties contemporaneously, or at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed together so far as determining the respective rights and interests of the parties...." *Bullfrog Marina, Inc. v. Lentz,* 28 Utah 2d 261, 501 P.2d 266, 271 (1972).

■ Where questions arise in the interpretation of an agreement, the first source of inquiry is within the document itself. It should be looked at in its entirety and in accordance with its purpose. All of its parts should be given effect insofar as that is possible. *Larrabee v. Royal Dairy Products Co.,* 614 P.2d 160, 163 (Utah 1980).

■ The 1920 agreement provided, among other things, that "[t]he City shall properly construct and perpetually and properly maintain a system of water pipes" to distribute the water over the area served by the Company's system for culinary uses. It specifically provided that pipes would be maintained in such a manner that there would be no loss or waste of water. The pipelines would be located and maintained "on the streets, avenues, lanes or places herein designated and for the distances herein set forth." Paragraph 20 of the agreement specifically stated that, "[a]ll of the pipes of the system to be laid in or on any of the streets, alleys or avenues, in this paragraph described and referred to is [sic] and shall be understood to be the 'Mains' as referred to in this agreement." The paragraph goes on to specifically describe exactly where the mains would run and what streets, avenues, and alleys would carry the mains. Thus, the agreement was

very explicit in describing exactly which pipes were the mains.

The 1920 agreement also clearly indicated that the parties intended the City to maintain the mains, and the Company to own and maintain a system. The agreement provided that the City would furnish and lay service pipes from the mains to the property line of each owner on the streets, alleys and other places where the mains were located. The City was also to provide galvanized pipe to the Company, "sufficient [for the Company] to construct such lines and convey the water from the part of the system hereinafter defined as the 'Mains' to the property line nearest the street of all persons upon the system of the Company whose property does not abut on the streets on which the 'Mains' are to be laid." Paragraph 11 of the 1920 agreement stated, "[t]he City shall be responsible for the proper maintenance of all that part of the pipeline system herein referred to as the 'Mains'...." Paragraph 10 provided that the City would install street hydrants, to be furnished by the Company, and after installation the Company "shall maintain said hydrants and other parts of said system except that part thereof defined as the 'Mains'." Although there was some clumsy phrasing within the document, it is apparent, viewing the agreement as a whole, that the City was to maintain and repair the mains, as defined in paragraph 20, and the Company had the responsibility to maintain the rest of the system.[1]

The question now becomes whether or not the 1965 agreement modified, in express terms, any of the conditions or provisions of the 1920 agreement. Paragraph III states that the City has the responsibility "[t]o maintain and operate, at its own cost and expense all of the Company system, including the reading of individual meters semi-annually ... and the issuing of

1. "In the interpretation of a contract the whole agreement must be considered, and the whole object is not to determine what the parties meant to say, but the meaning of what they did say. (citations omitted) Provisions which are apparently conflicting are to be reconciled and

harmonized, if possible, by reasonable interpretation so that the entire agreement can be given effect." *Exxon Corp. v. Eastman Kodak Co.,* 589 S.W.2d 473, 478 (Tex.Civ.App.1979) *rev'd on other grounds,* 608 S.W.2d 208 (Tex.1980).

statements and collection of the amounts due from individual stockholders of the Company...." Clearly, this is a modification of the 1920 agreement, since, in addition to the mains, the City has agreed to maintain and operate the Company system.

It is significant that this agreement concerns three different types of water users: Company shareholders, private owners who agree with the City that the City will maintain and operate their private service lines running from the mains to the meters in return for equitable contribution, and private owners who own service lines connecting to the mains but do not enter into an operation and maintenance agreement with the City.

Paragraph IV of the agreement requires the City "[t]o take over, with the consent of the private owners, and maintain and operate such private lines ... only upon special agreement with the private parties involved and with equitable contribution from such private parties." Paragraph A states, "[w]hen operation and maintenance of private lines have been pursued by the City as provided under paragraph IV *such lines shall thereafter be construed as Company lines.*" (emphasis added) Thus, the City agreed not only to operate and maintain the service lines leading to shareholders' property, but also the service lines (private lines) belonging to private owners who had entered into an agreement with the City.

Paragraph L then provides that,

[t]he City shall have the right to require any reasonable repair of private lines, *and individual service lines* and in the event of failure to comply with such requirement upon reasonable notice, City shall have the right to make such repairs and bill the private owners

therefor and shall have the right to shut off to enforce collection of such expense so incurred. (emphasis added)

If this paragraph is interpreted to apply to service lines of *all* property owners, then it is repugnant to paragraph III, wherein the City had previously agreed to maintain and operate all of the Company system. However, if it is interpreted to only pertain to those private service lines with respect to which the owners have *not* entered into an agreement with the City, and, therefore, would not be part of the Company system, then there is no such ambiguity.[2] The City would then have the ability to operate, maintain and prevent waste for the total delivery system, not only for Company shareholders, but also for private owners who had, under paragraph IV, entered into an agreement with the City for maintenance, and for private owners who had not entered into an agreement, as provided for in paragraph L. This would be consistent with what appears to be the overall intent of the two agreements:[3] that the City have total control and responsibility for the delivery system of culinary water to all of the users in the Company area. The concern the City has, as previously noted, is to assure correct water use measurement and to prevent the waste of water through any defect in the system prior to that water going through the meters, at which point the owners would then be paying for the water and the City would no longer have any concern. That the City intended to take over total control is apparent from the conditions in the 1965 agreement in which it agreed to deliver the water, to meter it, take over ownership of the meters, bill the users and collect from them.[4] In essence

---

**2.** It is axiomatic that a contract should be interpreted so as to harmonize all of its provisions. *Jones v. Hinkle,* 611 P.2d 733, 735 (Utah 1980) (citing *Vance v. Arnold,* 114 Utah 463, 201 P.2d 475 (1949)). *See also Minshew v. Chevron Oil Co.,* 575 P.2d 192, 194 (Utah 1978) (The established rules of contract interpretation require consideration of each of its provisions in connection with the others and, if possible, to give effect to all.)

**3.** "We start our analysis with a basic tenet of contract law: where two seemingly conflicting

contract provisions reasonably can be reconciled, a court is required to do so and to give both effect. (citations omitted) This applies with equal force where two documents are contemporaneous and related or when one incorporates the terms of the other." *Proyecfin de Venezuela v. Banco Industrial de Venezuela,* 760 F.2d 390, 395–96 (2d Cir.1985).

**4.** "It is a fundamental rule that in the construction of contracts the courts may look not only to the language employed, but to the subject-matter and the surrounding circumstances.... (ci-

this was the City's business: to provide, deliver and sell water to the users.

Because we interpret the two contracts to be clear as to the intent and meaning of the parties, there is no need to address the other arguments of respondent.[5] The judgment of the trial court is reversed. No costs awarded.

BILLINGS and JACKSON, JJ., concur.

tation omitted) To ascertain the intention, regard must be had to the nature of the instrument itself, the condition of the parties executing it, and the objects they had in view. The words employed, if capable of more than one meaning, are to be given that meaning which it is apparent the parties intended them to have." *Kintner v. Harr,* 146 Mont. 461, 408 P.2d 487, 494 (1965).

5. "[T]he trial court based its judgment mainly upon a finding that the quoted contractual provisions were repugnant.... Proceeding from that premise, the court applied various secondary rules of contract interpretation to reach its ultimate conclusion that the first quoted provisions must be disregarded and that those quoted later should be given effect. Such an approach is improper, however, because an effort must first be made to reconcile the apparent repugnancies so that the entire agreement can be given effect. It is only after such an effort fails and the provisions are in *irreconcilable conflict,* that the secondary rules of interpretation such as those favoring specific provisions over general, first stated provisions over later ones, and a construction against the scrivener are to be applied." (emphasis in original) *Exxon Corp. v. Eastman Kodak Co.,* 589 S.W.2d 473, 478 (Tex. Civ.App.1979), *rev'd on other grounds,* 608 S.W.2d 208 (Tex.1980).