400 P.2d 20

Gladys S. BULLOUGH, Winifred S. McDonald, Grace S. Malquist, Irma S. Hannibal, Cleveland K. Sims and Louis K. Sims, Plaintiffs and Respondents,

v.

George Milton SIMS, Elmer L. Sims and Beverly Sims Candland, Executors of the Estate of Milton K. Sims, Deceased, George A. Sims, G. Grant Sims, Elmer L. Sims, Sims Realty Company, a Corporation, Evelyn B. Mazuran, Marjorie S. Sims, Lillian Sims and Robert E. Sims, Defendants and Appellants.

Gladys S. BULLOUGH, Winifred S. McDonald, Grace S. Malquist, Irma S. Hannibal, Cleveland K. Sims and Louis K. Sims, Plaintiffs and Respondents,

v.

George Milton SIMS, Elmer L. Sims and Beverly Sims Candland, Executors of the Estate of Milton K. Sims, Deceased, Defendants and Appellants.

No. 10039.

Supreme Court of Utah.

March 17, 1965.

Pugsley, Hayes, Rampton & Watkiss, Salt Lake City, for appellants.

Earl D. Tanner, Salt Lake City, Edward M. Berol, San Francisco, Cal., for respondents.

CALLISTER, Justice:

George H. Sims founded a company known as Salt Lake Transfer Company. He had nine children and brought his two oldest sons, George A. and Milton, as partners into the business. George H. held a 60 per cent interest in the partnership and the two sons 20 per cent each. Profits were to be divided one-third to each.

On April 2, 1932, two days before his demise, George H. conveyed by bill of sale his partnership interest to his nine children in equal undivided shares. On April 5, 1932, the two remaining partners, George A. and Milton formed a new partnership which did not include the other children.

On April 6, 1932, shortly after the interment of their father, George A. had a meeting with his younger brothers and sisters (Milton was not present). George A. presented them with an agreement which he desired them to sign so that he and Milton could continue the operation of the business without interruption or interference. They all signed the document without reading or discussing its meaning.

The bill of sale executed by the father contained the phrase "In any case any grantee wishes to withdraw his or her interest in the partnership property, the value of the same shall be appraised by Gladys S. Bullough and George A. Sims and the figure set by these two shall be binding upon the withdrawing grantee."

The agreement of April 6, 1932, reads as follows:

"WHEREAS, GEORGE H. SIMS, GEORGE A. SIMS, AND MILTON K. SIMS have been engaged as co-partners under the style of SALT LAKE TRANSFER COMPANY, and

"WHEREAS, the said partners owned interest to the extent of three-fifths to the

first individual and one-fifth to each of the others in the property of the partnership on hand on December 31, 1927, and

"WHEREAS, each partner has owned a one-third interest in the profits of the partnership since the said date, and

"WHEREAS, under the Bill of Sale executed and delivered by GEORGE H. SIMS under date of April 2, 1932, GLADYS S. BULLOUGH received a two-ninths interest in the share of the partnership owned by GEORGE H. SIMS and all the other children of GEORGE H. SIMS, excepting JOHN G. SIMS, received a one-ninth interest, and

WHEREAS, these children of GEORGE H. SIMS who have not been in the partnership desire to sell their interest in the partnership to the two remaining partners and the latter are willing to purchase the same and have organized a partnership hereafter described as the present Salt Lake Transfer Company, and

"WHEREAS, the undersigned approve of such Bill of Sale and of the method therein set forth for valuing the share owned by GEORGE H. SIMS at the time of the execution of such Bill of Sale,

"NOW, THEREFORE, it is agreed between the undersigned children of GEORGE H. SIMS who were not partners in the former Salt Lake Transfer Company, vendors and the present Salt Lake Transfer Company, a co-partnership consisting of GEORGE A. SIMS and MILTON K. SIMS, vendees, as follows:

"1. That each intends to be legally bound hereby.

"2. That the present Salt Lake Transfer Company, a co-partnership, vendee, hereby purchases, and each of the vendors hereby sells and conveys all the latter's interest in and to the former Salt Lake Transfer Company, together with the good will thereof and all property, real or personal, held by, under or connected with the former Salt Lake Transfer Company including the sole right to use the said trade name, and the said purchaser assumes all obligations of the former partnership and agrees to pay the same.

"3. The present Salt Lake Transfer Company agrees, upon six months demand from the person so selling, to pay for each one-ninth so purchased, one-ninth of the sum found as the value of the GEORGE H. SIMS interest as per the Bill of Sale above mentioned.

"4. The present Salt Lake Transfer Company agrees that until such purchase sum is demanded or is paid, it will pay one-twenty-seventh of the net monthly profits, if any, for each ninth so purchased. Upon demand for the purchase price, the seller's right to share in the profits shall cease and he or she shall be entitled to interest on the sale price at six percent per annum until paid.

"5. Each partner shall be entitled to a monthly salary in the amount of $200.00, as part of the overhead of the business. The partners of the present partnership shall be the sole judge of what is a capital investment. The purchaser shall be entitled, at any time, to pay any seller the purchase price for his share plus accrued net profits, or interest, to date of payment, as may be required in the particular case under the other provisions of this Agreement.

"6. Each of the vendors covenant that no sale or transfer of the interest in the old partnership has been made by such vendor.

"IN WITNESS WHEREOF, we have hereunto set our hands and seals this 6 day of April, 1932."

In 1946 George A. and Milton took their sons Grant and Elmer into the partnership. Milton died in 1959, prior to this controversy.

In 1960 the partners offered to purchase the interests of the other sons and daughters, but a value could not be agreed upon and the latter group, as plaintiffs, instituted this action against the partners and Milton's estate as defendants. The suit was commenced June 3, 1960.[1]

At the trial plaintiffs contended that the April 6, 1932, agreement was void for fraud, mistake or undue influence, or, if not void then they were partners or co-owners and entitled to have their interests evaluated as of June 3, 1960.

Defendants, on the other hand, contended that a valid sale and purchase of plaintiffs' interest was effected by the April 6, 1932, agreement at an agreed price as of that date, the purchase price to be paid at a later date.

The trial was divided into two phases, the first was an interpretation of the contractual relations between the parties, and the second an evaluation of the plaintiffs' interests.

The lower court found that the agreement was not void for fraud, mistake or undue influence. It found that the plaintiffs were not partners but co-owners and that their interests should be evaluated as of June 3, 1960. The court then determined the value of plaintiffs' share was $229,842.07; less $48,000 which had previously been paid, leaving a balance of $181,842.07. Defendants appeal from this judgment.

Defendants argue that the terms of the April 6, 1932, agreement are unambiguous and provide for a present sale as

---

1. Prior to the commencement of the action, John Sims sold his interest to George A. Sims for $10,000.

of that date, and that parol evidence cannot alter or change its plain meaning. This is generally true, but there are exceptions; one of which is that when the parties place their own construction on it and so perform, the court may consider this as persuasive evidence of what their true intention was.[2]

■ In spite of some recitals in the agreement to the contrary, the parties have demonstrated by their conduct for twenty-eight years that until the demand or tender of payment occurred, there was no withdrawal within their interpretation of the bill of sale and the agreement. Their actions were indicative of a clear intent that the agreement was not a present sale but rather an agreement to establish the terms whereby the parties could effect the orderly future withdrawal of the plaintiffs' capital investment.

■ The California Supreme Court has aptly stated:[3]

"This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform un-der it and demonstrate by their conduct that they knew what they were talking about the courts should enforce their interest.

"Appellants correctly claim that this doctrine of practical construction can only be applied when the contract is ambiguous, and cannot be used when the contract is unambiguous. That is undoubtedly a correct general statement of the law. [Citations omitted]. But the question involved in such cases is ambiguous to whom? Words frequently mean different things to different people. Here the contracting parties demonstrated by their actions that they knew what the words meant and were intended to mean. Thus, even if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced. In such a situation the parties by their actions have created the 'ambiguity' required to bring the rule into operation. If this were not the

---

2. Hardinge v. Eimco Corp., 1 Utah 2d 320, 266 P.2d 494 (1954).

3. Crestview Cemetery Ass'n v. Dieden, 54 Cal.2d 744, 8 Cal.Rptr. 427, 356 P.2d 171 (1960).

rule the courts would be enforcing one contract when both parties have demonstrated that they meant and intended the contract to be quite different."

The status of the plaintiffs as co-owners was indicated in the proprietary portion of the income tax returns of the company. Losses on the sale of stock and charitable deductions were allocated pro rata to the owners, including plaintiffs, each according to his or her interest. Significant is the fact that the company retained $27,000 of accumulated profits belonging to the plaintiffs as working capital, although the plaintiffs paid their proportionate share of the taxes thereon. The defendants caused the tax returns to be prepared and there is no evidence that at any time the disbursements to plaintiffs were treated as interest upon an unpaid purchase obligation; on the contrary, they were treated as a return upon a proprietary interest.

In 1947, there was an evaluation made by plaintiff Gladys S. Bullough and George A. of the book value of the shares of plaintiffs, as of 1932, at $3,614.14. Yet, in 1959, after Milton's death, George A. offered plaintiffs $18,000 for each of their shares. This offer was withdrawn by George A. However, this offer is also indicative of the fact that George A. did not interpret the agreement as a present sale in 1932 at a valuation as of that year.

The construction of the agreement by defendants, which is amply demonstrated by their behavior over a period of many years, is convincing evidence of their intention as to the meaning of its language, and is consistent with the understanding of the plaintiffs that they were either partners in or co-owners of the business, although they had agreed not to participate in or interfere with its management.[4]

■ The April 6, 1932, agreement was in effect a settlement whereby the plaintiffs relinquish their rights to their share of the assets at the time of the dissolution of the original partnership when George H. sold and assigned his entire interest therein to his children.[5] They elected to remain,

4. Hodges Irrigation Co. v. Swan Creek Canal Co., 111 Utah 405, 181 P.2d 217 (1947). " 'To warrant the court in according great weight to, or adopting, a practical construction by the parties, it is necessary and sufficient that each party shall have placed the same construction on the contract. While the construction placed by one party on his own language in a contract is the highest evidence of his own intention, the meaning of the contract cannot be established by the construction placed on it by one of the parties, unless such interpretation has been made to and relied on by the other party, or has been known to and acquiesced in by the other party, * * * ' "

5. 48–1–24, U.C.A.1953; Webb v. Webb, 116 Utah 155, 209 P.2d 201 (1949).

**310**

as found by the trial court, as co-owners until the condition precedent of withdrawal occurred, at which time an evaluation of their interest and/or a distribution in conformity thereof were to be made according to the terms of the agreement. The trial court correctly determined that any prior evaluation was not binding or proper within the contemplation of the parties and that the action of June 3, 1960, constituted a demand for payment, a right under the agreement which had not previously been exercised.

Under the special circumstances of this case, it would be patently unfair if the defendants were allowed to retain the plaintiffs' capital investment, as well as a portion of their profits, as working capital during a twenty-eight year period when the assets greatly increased in value, and then deny them a share in this increment.

The interpretation of the agreement by the trial court is amply justified by the facts and circumstances surrounding its execution and the conduct of the parties subsequent thereto. The evaluation of the plaintiffs' interest, as of June 3, 1960, is supported by the evidence.

Affirmed. Costs to plaintiffs.

HENRIOD, C. J., and McDONOUGH, CROCKETT and WADE, JJ., concur.