501 P.2d 266

**BULLFROG MARINA, INC., Plaintiff and Appellant,**

**v.**

**Gilbert M. LENTZ, Defendant and Respondent, and Cross-Appellant.**

**No. 12503.**

Supreme Court of Utah.

Sept. 20, 1972.

Henriod, J., concurred and dissented in part and filed opinion.

Biehle, Jones, Murphy & Haslam, Irving H. Biehle, W. Jeffrey Fillmore, Salt Lake City, for plaintiff and appellant.

Duane A. Frandsen, Price, for defendant and respondent.

**264**

CALLISTER, Chief Justice:

Plaintiff initiated this action, alleging that it was a lessee of three houseboats under a written agreement for a term of two years and that defendant, lessor, by removing said boats from plaintiff's dock had converted plaintiff's possessory interest therein. In a second cause of action, plaintiff alleged that it had entered into an employment contract with defendant which defendant had breached, resulting in damage to plaintiff. Plaintiff further filed an affidavit for attachment of the houseboats and a housetrailer on the ground that defendant was a nonresident of this State, Rule 64C(a), U.R.C.P.

The trial court released the attachment on the basis that defendant was a resident of this State within the meaning of the rules of attachment. The trial court further held that the employment contract and lease between the parties were terminated and were of no further force or effect and that neither party had any right, title or interest thereunder. The trial court awarded judgment against defendant for a certain sum of money collected and retained by defendant to settle the account between the parties. Plaintiff was awarded $1000 for the value of certain items of personal property consisting of furnishings and equipment located on the boats at the time defendant removed them. The trial court determined that neither party was entitled to attorney's fees; the other provisions of the judgment are not challenged on appeal and will not be related herein. Plaintiff appeals, and defendant cross-appeals.

Plaintiff, a corporation, was a concessionaire of the National Park Service and had the exclusive right to operate tourist facilities at Bullfrog Basin on Lake Powell in San Juan County, Utah. Under plaintiff's contract with the government, if plaintiff entered into a subconcession contract with anyone, the government, in addition to its regular franchise fees, was entitled to 50 per cent of the compensation received by plaintiff. Furthermore, any contract or agreement which plaintiff proposed to enter with respect to the exercise by others of any privilege granted under the concession contract was required to be submitted to the government for approval.

In 1969 plaintiff determined that as part of its service it would like to rent houseboats to the public at Bullfrog. Defendant was desirous of operating a houseboat business on Lake Powell. The parties entered negotiations to initiate the houseboat operations. They deemed a successful operation would entail the use of six houseboats; and each party was to procure three, and defendant was to manage the operation, including the advertising, reservations and bookkeeping. They commenced operation in May of 1969 under an oral agreement, which they desired reduced to writing. Since the parties desired to avoid the finan-

cial consequences which would occur if the National Park Service deemed defendant a subconcessionaire, the parties subsequently executed two written contracts, which were back-dated to May 1969. One was an employment contract, wherein plaintiff employed defendant to operate a houseboat rental service with his remuneration to be a share of the net profits; this agreement was for a term of two years but could be terminated for cause by either party by a two-week written notice. Among the causes enumerated, which granted the employee the right to terminate, was unreasonable restrictions in the performance of work, with it being understood that the employee was in general to manage the division. The employment contract was signed by the parties on July 31, 1969, but was dated to May 19, 1969. The second written agreement was designated a lease, wherein defendant leased plaintiff three houseboats for a term of two years. The lease recited that plaintiff represented that it had no experience in the rental of houseboats and desired to lease them on a use basis; the lessor was to receive 40 per cent of the rental. This agreement included a provision for attorney's fees resulting from a breach. The parties dated this agreement May 31, 1969, but it was actually signed either August 19, 1969, according to plaintiff, or October 10, 1969, according to defendant.

Defendant completed his duties at Bullfrog for the 1969 boating season on October 15, and departed to travel through the western United States and Mexico. On approximately November 23, 1969, defendant returned to Bullfrog and removed his three boats to Hall's Crossing across Lake Powell. Subsequently he submitted a letter, dated November 28, 1969, to plaintiff terminating both the employment agreement and the lease. Defendant asserted that he had cause to terminate by reason of plaintiff's diverting control of the advertising and reservations from him. Furthermore, plaintiff had failed to submit the contracts to the government, although the National Park Service had sent a letter July 15, 1969, making inquiry and stating that its clearance was necessary to ensure that plaintiff was not entering into a sub-concession contract. Defendant's position was that plaintiff was eliminating him from participating in the 1970 boating season, i. e., plaintiff commenced using defendant's trade name "Aqua Cruz" and receiving the reservations directly. By plaintiff's procrastination in submitting the agreements to the government, defendant was left without knowing whether he would be able to conduct the operations in 1970.

On appeal, plaintiff asserts that the trial court erred in its determination that based upon all the facts and circumstances in evidence the lease and employment contract should be considered together as one contract and each part was interdependent

upon the other. Plaintiff urges that the lease was a separate and distinct agreement and that thereunder it was entitled to possession of the houseboats for two years and that defendant was liable in damages for the conversion of plaintiff's possessory interest.

To substantiate its argument plaintiff cites the principle that when parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties; and that parol evidence of contemporaneous conversations, representations or statements will not be received for the purpose of varying or adding to the terms of the written agreement.[1]

■ The foregoing principle is correct when applied to an integrated contract. The issue of this action is whether the lease represented a final and complete expression of the agreement of the parties or was merely a written memorandum by which part of the contract may be proved.

Section 228, Restatement, Contracts, states:

An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted.

■ Comment a. of Section 228 explains that integrated contracts must be distinguished from written memoranda by which contracts may be proved. An essential element of an integration is that the parties shall have manifested assent not merely to the provisions of their agreement but to the writing or writings in question as a final statement of their intentions as to the matters contained therein. Whether a document was or was not adopted as an integration may be proved by any relevant evidence.

■■ Whenever a litigant insists that a writing that is before the court is an integration and asks the application of the parol evidence rule, the court must determine as a question of fact whether the parties did in fact adopt a particular writing or writings as the final and complete expression of their bargain.[2] In determining the issue of the completeness of the integration in writing, evidence extrinsic to the writing itself is admissible. Parol testimony is admissible to show the circumstances under which the agreement was made and the purpose for which the instrument was executed.[3]

1. Rainford v. Rytting, 22 Utah 2d 252, 451 P.2d 769 (1969).

2. 3 Corbin on Contracts, § 588, pp. 528–529.

3. Id., § 582, p. 451; Dennis v. Southworth, 2 Wash.App. 115, 467 P.2d 330, 335 (1970).

In the instant action the trial court found that after full consideration of the entire transaction, including the purpose to be served by the lease and the employment contract, defendant would not have leased the boats to plaintiff, unless he could operate the houseboat rental service. The trial court concluded that the lease and employment contract bore a relationship to one another and should be considered as one agreement. Since the issue of whether the lease was an integration was a factual question, and there was substantial evidence to support the determination of the trial judge, his finding must be sustained. The trial court did not err in following the rule of law that where two or more instruments are executed by the same parties contemporaneously, or at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed together so far as determining the respective rights and interests of the parties, although they do not in terms refer to each other.[4]

Plaintiff further contends that the trial court erred in its interpretation of the provisions of the employment contract under which defendant's incentive commission was calculated.

The employment contract provided that defendant would be paid an incentive commission equal to 80 per cent of the net income for the calendar quarter. The contract specified that net income should be determined by deducting from the gross income all costs and expenses of the operation of the houseboat rental service. The contract further defined costs and then provided: "All wages and commissions paid or due during the period will be considered as costs."

Defendant in rendering his monthly accountings calculated his incentive commission by taking 80 per cent of the net income; he did not consider his share of the profits as a cost in the calculation. In the process of litigation, plaintiff engaged a Certified Public Accountant, who subsequently testified that in his opinion under the terms of the contract defendant's commissions were deductible as a cost in arriving at the net income. The witness suggested that such a computation might be made by one of two methods, either an algebraic formula of simultaneous equations whereby one may solve for two unknowns or by an arithmetic computation by trial and error.

The trial court rejected the accountant's interpretation of the contract and found that the parties had never discussed, understood or agreed upon that method but had accepted and operated under the system

---

4. Strike v. White, 91 Utah 170, 175, 63 P.2d 600 (1936); West v. Prairie State Bank, 200 Kan. 263, 436 P.2d 402 (1968); Harm v. Frasher, 181 Cal.App. 2d 405, 5 Cal.Rptr. 367 (1960); 4 Williston on Contracts (3d Ed.) § 628, p. 904.

**268**

employed by defendant. Defendant had presented several accountings to plaintiff prior to the events that led to this litigation, and plaintiff had accepted the calculations without protest.

■ In Hardinge Co. v. Eimco Corp.,[5] this court stated that in the interpretation of contracts, the interpretation given by the parties themselves as shown by their acts will be adopted by the court. (We think this should be: will be regarded as advisory.) In Bullough v. Sims.[6] this court explained that when parties place their own construction on their agreement and so perform, the court may consider this as persuasive evidence of what their true intention was. It is true that the doctrine of practical construction may be applied only when the contract is ambiguous; but the question becomes ambiguous to whom? Where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced. In such a situation, the parties by their actions have created the ambiguity to bring the rule into operation. If this were not the rule, the courts would be enforcing one contract when both parties have demonstrated that they meant and intended to the contract to be quite different.

■ The trial court did not err in accepting the method of computation to derive the incentive commission used by the parties prior to the controversy.

Plaintiff further contends that the trial court erred by denying the costs of $320.80 incurred in the issuance of the attachment of the houseboats and trailer. The trial court ruled that residence was a matter of intention and that under all the facts and circumstances in evidence, plaintiff had not sustained its burden of proving defendant's nonresidence. The trial court found that plaintiff did not by a preponderance of the evidence overcome defendant's testimony to the effect that when he came to Utah he intended to become and to remain a resident of this State, and he was a resident at the time of the issuance of the attachment.

The facts adduced indicate that defendant owned a home in Fillmore, California. He came with his wife and child in April 1969 to Bullfrog Marina, where he lived in a housetrailer, which he owned, during the boating season. He retained his ownership in his home in California, which was occupied by his adult child. At the close of the boating season, defendant left his trailer at Bullfrog and traveled in a smaller trailer. He returned to Utah several times, including the occasion when he transported the boats to Hall's Crossing. Plaintiff has emphasized the evidence that defendant de-

5. 1 Utah 2d 320, 323, 266 P.2d 494 (1954).

6. 16 Utah 2d 304, 308, 400 P.2d 20 (1965).

clared himself a nonresident on his 1969 Utah income tax, that his registration of his cars and trailers was in California, and that he failed to procure a Utah driver's license until March 30, 1970. The complaint and affidavit for attachment were filed February 18, 1970.

■ In a proceeding to discharge an attachment, where the defendant has denied the ground averred in plaintiff's affidavit, the burden is upon the plaintiff to establish by a preponderance of the evidence the existence of such facts as justified issuing the attachment.[7] An order granting or denying a motion to discharge an attachment based upon conflicting evidence will not be reversed unless clearly wrong.[8]

In Hanson v. Graham,[9] the court observed that the word "residence" as that of "domicile" was often used to express different meaning according to the subject matter. In statutes relating to taxation, settlements, right of suffrage, and qualification for office, "residence" may have a very different construction from that which belongs to it in the statutes relating to attachments. The court stated that although the casual or temporary sojourn of a person in that state, whether on business or pleasure, did not make him a resident of the state within the meaning of the attachment laws, especially if his personal domicile were elsewhere, it was not essential that he should come into the state with the intention to remain permanently to constitute him a resident. The court explained that the foregoing rule rested upon the principle that an attachment was permitted against a nonresident as one mode of acquiring jurisdiction in a suit against him. This purpose would not be served, if the debtor could preserve a constructive residence in the state from which he had departed by a general intention to return, when he was in fact residing in another state. The court held that a prima facie case of nonresidency had been established in the state from which defendant had departed, where the evidence indicated that he had left the state for the purpose of engaging in business in a foreign country.

In Jacobsen v. Kill,[10] the court stated that the issue of whether a man has changed his residence from one state to another, so as to become a resident of the latter depended very largely upon his intention. The court cited the authority to the effect that residence was acquired by actual presence in the state, coupled with the inten-

---

7. Western Auto Co. v. Gurnea, 73 Utah 423, 429, 274 P. 863 (1920) ; J. R. Watkins Company v. Sorenson, 166 Neb. 364, 88 N.W.2d 902 (1958).

8. J. R. Watkins Company v. Sorenson, note 7, supra.

9. 82 Cal. 631, 23 P. 56, 57 (1890).

10. 94 Okl. 146, 221 P. 21, 23 (1923).

tion to remain there permanently or for an indefinite period.

. . . The point that marks the dividing line between those cases of temporary absence which do not constitute the absentee a nonresident of the state of his original domicil and a resident of the state to which he has gone, and the cases of absence which do effect such a change within the meaning of the attachment laws, is somewhat indistinct. . . . It has been stated that there must be a settled, fixed abode, an intention to remain permanently,—at least, for a time, for business or other purposes,—to constitute a residence in the state to which the debtor has gone and a nonresidence in the state of his original domicil . . ..[11]

▉ In the instant action, defendant came to Utah to engage in business; he established his abode in a trailer house set upon blocks; he expressed an intention to remain and to be a resident of Utah. At the time of filing the complaint and attachment, defendant was not present in the State, but the evidence indicated that he was traveling during the season boating operations were not conducted. The issue of his residence was a close question; however, we cannot hold that the trial court erred in its determination that plaintiff had not sustained its burden to prove defend-

ant's nonresidency by a preponderance of the evidence.

▉ Defendant cross-appeals and urges that the trial court erred in striking an item of $3155.69 which was the remaining money in the houseboat checking account at the end of October 1969. The trial court reasoned that since the bank account was owned by plaintiff, the funds remaining should not be charged against plaintiff in the final accounting between the parties. Plaintiff has elected not to respond specifically to defendant's contention.

Each party engaged his own accountant and presented an accounting; the trial court adopted the accounting of defendant's accountant with the foregoing exception. The evidence established that plaintiff opened the account as a depository for the houseboat operations. The evidence further revealed that defendant did not put all the funds he collected in this account. Furthermore, both parties paid expenses from sources other than the account. Both parties, however, received disbursements from this account, which were evidenced by checks drawn on the account. It is essential to this action to ascertain the deposits and withdrawals from this account to determine the difference between the total amount collected by defendant and the amount deposited with appropriate offsets for expenses and share of the profits. It

11. 26 A.L.R. 180, Anno: Attachment—Nonresidence, IV, p. 191.

is of significance that plaintiff's accountant also used the total cash deposited to the houseboat account in his calculation of the amount which defendant owed plaintiff.

Defendant's accountant, in his testimony, proceeded from the standpoint of what plaintiff had received, included therein was the money remaining in the account at the end of the season. He testified that defendant owed plaintiff $548.02. Plaintiff's counsel pointed out to the court that the account from its inception was plaintiff's property, and the court struck the sum remaining from the accounting.

Since the plaintiff owned the account, it would be appropriate to determine the amount to which defendant was entitled.

| | |
|---|---|
| $28,452.58 | Total cash received in boating operation |
| 19,913.90 | Deposited in plaintiff's account |
| 8,538.68 | Collected and not deposited by Lentz and Bullfrog |
| 618.73 | Collected by Bullfrog and not deposited |
| 7,919.95 | Money collected by Lentz and not deposited |
| 10,663.39 | Salary plus payments to Lentz from account |
| 18,583.34 | Total of all money received by Lentz |
| 18,035.32 | Amount to which Lentz entitled for expenses, share of profits, and rental of three boats |
| $ 548.02 | Amount defendant owes plaintiff |

Since in computing the amount which defendant owes plaintiff remains the same whether it is calculated from the aspect of what was defendant's or plaintiff's share, it appears that the trial court erred in striking the offset of $3155.69. With this exception, the judgment of the trial court is affirmed. Costs are awarded to defendant.

TUCKETT, ELLETT and CROCKETT, JJ., concur.

HENRIOD, Justice (concurring and dissenting in part).

I concur except as to the parts of the opinion with respect to 1) costs of attachment and 2) the item of $3155.69, to which I dissent.

1): It seems unreasonable to conclude that Lentz was a Utah resident since he had a permanent home in California, where his children lived; filed a sworn-to tax return in California, *claiming residence there*,—presumably paying his taxes there in Utah produced income; filed a similar Utah tax return *claiming residence there*, not in Utah; was absent from Utah from October 1969 until after the attachment issued against his property in Utah; that he resided at Bullfrog during the summer business months, in his own trailer home which conveniently was registered in California; and that he didn't even bother to obtain a Utah driver's license until after the incident of the attachment proceedings. His highly self-serving statement that he intended to reside in Utah seems to be as transparent as it is incredible.

2): The accounting testimony hardly was harmoniously consistent, one C.P.A.'s testimony appearing equally impressive or unimpressive to a point where we may as well sharpen the old saw and employ it here as anyplace else, to the effect that if there is any believable evidence to support the trial court, we will affirm it,—which was done with respect to other disputatious evidence in this case.