2008 UT 20

**TANGREN FAMILY TRUST, by Richard Tangren, Trustee and Richard Tangren, individually, Plaintiff and Petitioner,**

v.

**Rodney TANGREN, Defendant and Respondent.**

No. 20070097.

Supreme Court of Utah.

Feb. 29, 2008.

Craig C. Halls, Blanding, for plaintiff.

Matthew P. Jube, Provo, for defendant.

DURRANT, Justice:

## INTRODUCTION

¶ 1 We granted certiorari in this case to consider the court of appeals' assessment of the parol evidence rule. The trial court considered extrinsic evidence in determining that the lease at issue is invalid. The court of appeals reversed and held that while the trial court properly considered extrinsic evidence in determining whether the lease is an integrated writing, it erred in finding the lease to be invalid. The court of appeals so concluded primarily because the lease contains a clear integration clause. The court of appeals concluded that the lease is valid, integrated, and unambiguous. We consider the question of when extrinsic evidence is permitted on the question of integration where the contract at issue contains a clear integration clause. We conclude that extrinsic evidence of a separate oral agreement is not admissible in the face of such a clause. Thus, although we affirm the court of appeals' conclusion that the lease is valid, integrated, and unambiguous, we disagree with the court's assessment of the parol evidence rule insofar as it allowed extrinsic evidence to be considered in assessing whether the lease is an integration.

## BACKGROUND

¶ 2 In 1981, Richard Tangren purchased approximately 135 acres of unimproved land near the Colorado River from the State Institutional Trust Lands and the Bureau of Land Management. This property has since been held in trust by the Tangren Family Trust, of which Richard is the trustee and his children, including his son Rodney Tangren, are beneficiaries.

¶ 3 Richard decided to build a dude ranch on the land. To this end, he built a building with a basement and connecting tunnels, which he intended to use for storage or guest accommodations, by blasting an area out of the side of a mountain. He also built a horseshoe pit, a tennis court, a baseball diamond, a shooting range, an airplane runway,

and horse corrals. Notwithstanding these improvements, the property has never actually operated as a dude ranch because it lacks running water, electricity, and facilities to prepare food for guests.

¶ 4 Rodney assisted his father in making these improvements to the ranch. In fact, among all of Richard's children, Rodney was the only one who showed significant interest in the ranch. In order to make progress on improvements at the ranch, Richard kept Rodney on the payroll of Richard's fencing company but allowed Rodney to work at the ranch. In the early 1990s, Rodney quit his job at the fencing company in order to work on the ranch full-time.

¶ 5 At some point, Rodney became concerned that he would lose his investment of capital and time that he had put into the ranch. Specifically, he worried that once the ranch became profitable, his siblings, who are also beneficiaries under the Tangren Family Trust, would attempt to take his interest in the ranch. In 1992, in response to these concerns, Richard had his attorneys prepare a lease agreement (the "Lease"). Under the terms of the Lease, Richard, as trustee of the Tangren Family Trust, agreed to lease the property to Rodney for ninety-nine years at $275 per month, which included rent, taxes, and insurance. The Lease also included an integration clause, which reads as follows: *"Entire Agreement:* This Lease contains the entire understanding between the parties with respect to its subject-matter, the Property and all aspects of the relationship between Lessee and Lessor." The Lease was first executed in 1992 and again executed in 1994. The only difference between the 1992 and 1994 versions, other than a change in the dates, was the removal of Rodney's wife, Paula Tangren, as a lessee.

¶ 6 In 2001, after Richard and Rodney's relationship deteriorated, Rodney recorded the Lease. Richard thereafter demanded payments under the terms of the Lease from Rodney, and Rodney tendered checks to Richard for the amount owed. Richard never cashed those checks. Richard ultimately filed this action against Rodney. In his original complaint, Richard claimed only that Rodney breached the terms of the Lease and sought to recover Lease payments and payment for Rodney's alleged damage to and removal of Richard's personal property from the ranch. In his amended complaint, filed during the course of the bench trial two years after the original complaint, Richard claimed that Rodney breached the Lease and that the Lease "did not form a valid contract between the parties because the conditions upon which it was entered into were never met." Rodney counterclaimed for damages relating to Richard's alleged trespass on the ranch and claimed fraud and negligent misrepresentation relating to the execution of the Lease.

¶ 7 During the bench trial, both Richard and Rodney testified regarding the Lease. Richard testified that the Lease was not intended to be a lease but rather a "stop gap" measure to prevent Rodney's siblings from taking Rodney's interest in the ranch at some point in the future. Richard testified that he did not intend for the Lease to be valid and that it was only to be used after his death.[1] Rodney also testified that the pur-

---

1. Richard testified in this regard as follows:

THE COURT: Did you talk to Rodney about why you were not giving him a copy [of the Lease]?

THE WITNESS [Richard Tangren]: Yes.

THE COURT: What did you say?

THE WITNESS: He knew, I told him I said, this lease, Rodney, is just a stop-gap measure. It is not a lease. I never intended it to be a lease. This is a document that will prevent your brothers, your sisters, six of them, ever ganging up on you sometime in the future. . . .

. . .

THE WITNESS: I said this document Rodney, will prevent your brothers and sisters from ever coming in and forcing you out of the ranch. Basically that's it.

THE COURT: Did you say anything more?

THE WITNESS: No. That was the idea of the document. That's why we prepared the document. I did.

THE COURT: Did you explain to him why you were not giving him the original of the lease?

THE WITNESS: Yes. Because it was not to be his because it wasn't a lease. It was only to be used and I had it in a place where the people running my estate when I died, they could bring it out and things, or destroy it or it never happened. In the meantime if there was anything that ever happened on any of my brother, his brothers and sisters part to come in and attempt to ace him out of the position that he was in, running the ranch, earning the

pose of the Lease was to protect him from his siblings. And he testified that this protection would be necessary only after his father's death.[2]

¶ 8 In its Findings of Fact and Order, the trial court found that the Lease was "intended as a protection against an incursion upon [Rodney] by his siblings and was not intended to govern actions as between Richard Tangren and Rodney Tangren and both parties agreed and understood that it would only take effect if challenged by Rodney's siblings." Further, the court found that the Lease "is not a valid document" and that Rodney "knew the 'Lease' was not intended as a functioning agreement between the Tangren Trust and [Rodney]." Because it found the Lease to be invalid, the court determined that Rodney had no obligation to pay rent to Richard. The court ordered Rodney off the ranch and provided him six months to remove his personal property. Rodney appealed.

¶ 9 The court of appeals reversed.[3] It explained that the trial court properly considered extrinsic evidence in assessing whether the Lease is an integration but that it erred in relying on Richard's "testimony regarding his intent in creating the Lease . . . in the face of a clear and unambiguous integration clause in the Lease itself."[4] Thus, the court of appeals concluded that "the trial court's findings as to integration were clearly erroneous."[5] The court of appeals found that the parties entered into a "valid, integrated, and unambiguous lease agreement" and remanded the case for a determination regarding Rodney's alleged breach of the Lease.[6] We granted certiorari to determine whether the court of appeals erred in its assessment of the parol evidence rule.

**STANDARD OF REVIEW**

¶ 10 On certiorari, we review the decision of the court of appeals, not the trial court.[7] Whether a contract is integrated is a question of fact reviewed for clear error,[8] and whether a contract is ambiguous is a question of law reviewed for correctness.[9]

money, distributing according to the things that we had set up. And as long as that was going on they could not come in because this lease would be found and I had it in a place where it would be found, and could be executed and he couldn't do it. They couldn't come in and run him off. It was not intended to be a lease, You Honor. It was intended to be a stop gap measure for that very reason. And that reason only.

**2.** Rodney testified in this regard as follows:

Q. [by attorney Craig Halls] . . . This lease was prepared for what purpose?

A. [by Defendant Rodney Tangren] It was to protect me from my brothers and sisters.

Q. And is it a fair statement to say that it was to, didn't you already testify that is was going to come into effect if something happened to your dad and your brothers and sisters came in and tried to take the ranch from you?

A. Yes. That's when they would squabble because he wasn't there to fight them. But as long as he was alive they wouldn't do nothing.

Q. The anticipation, as long as he was alive it was your anticipation that you and he would be out there working on this thing and it was a kind of a joint venture type thing and the lease wasn't required. It wasn't necessary.

A. No. That's not true. He basically, he would come and go, do things or whatever. I was the one that actually got in for, since actually before the lease. That's how I got the lease was all of the time that I'd spent mostly, because I didn't have any money back then. I did put money into the thing and that's when I went to him and said Dad, I need something to protect me. And that's how that lease got drawn up.

**3.** *Tangren Family Trust v. Tangren*, 2006 UT App 515, ¶ 1, 154 P.3d 180.

**4.** *Id.* ¶ 9.

**5.** *Id.*

**6.** *Id.* ¶¶ 13–14.

**7.** *E.g., Salt Lake County v. Metro W. Ready Mix, Inc.*, 2004 UT 23, ¶ 11, 89 P.3d 155.

**8.** *See State v. Levin*, 2006 UT 50, ¶ 20, 144 P.3d 1096 ("[A]n appellate court reviews the trial court's findings of fact for clear error."); *Bullfrog Marina, Inc. v. Lentz*, 28 Utah 2d 261, 501 P.2d 266, 270 (1972) ("[T]he court must determine as a question of fact whether the parties did in fact adopt a particular writing or writings as the final and complete expression of their bargain.").

**9.** *See Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 6, 78 P.3d 600.

## ANALYSIS

¶ 11 We have expounded on the parol evidence rule on a number of occasions and explained that

> as a principle of contract interpretation, the parol evidence rule has a very narrow application. Simply stated, the rule operates, in the absence of fraud or other invalidating causes, to exclude evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an *integrated* contract.[10]

Thus, if a contract is integrated, parol evidence is admissible only to clarify ambiguous terms; it is "not admissible to vary or contradict the clear and unambiguous terms of the contract."[11] The application of the parol evidence rule is therefore a two-step process: "First, the court must determine whether the agreement is integrated. If the court finds the agreement is integrated, then parol evidence may be admitted only if the court makes a subsequent determination that the language of the agreement is ambiguous."[12]

¶ 12 We have defined an integrated agreement as " 'a writing or writings constituting a final expression of one or more terms of an agreement.' "[13] To determine whether a writing is an integration, a court must determine whether the parties adopted the writing "as the *final and complete* expression of their bargain."[14] Importantly, we have explained "that when parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties."[15]

¶ 13 In this case, the Lease contains an integration clause entitled *"Entire Agreement"* in which Richard and Rodney explicitly agree that "[t]his Lease contains the entire understanding between the parties with respect to its subject-matter, the Property and all aspects of the relationship between Lessee and Lessor." Integration clauses, such as this one,

> "are routinely incorporated in agreements in order to signal to the courts that the parties agree that the contract is to be considered completely integrated. A completely integrated agreement must be interpreted on its face, and thus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document."[16]

¶ 14 Richard argues that, despite the clear integration clause to the contrary, the written Lease does not, in fact, contain the entire understanding between the parties, but that the parties entered into a separate oral agreement. Richard has characterized this separate oral agreement in two ways. First, he has argued that he and Rodney orally agreed that the Lease was not to be a valid lease at all. Second, he has argued that he and Rodney orally agreed that the effectiveness of the Lease was to be subject to a condition precedent—specifically, an incursion upon Rodney by his siblings after Richard's death. Regardless of which of these characterizations is accepted, Richard's argument amounts to a contention that a separate oral understanding overrides the written Lease's clear integration clause. We reject this argument.

¶ 15 Where a contract by an explicit term purports to be integrated, we will nevertheless allow extrinsic evidence in support of an argument that the contract is not, in fact, valid for certain reasons that we have specified. We have held that extrinsic evi-

---

10. *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1026 (Utah 1995) (citations omitted).

11. *Id.* at 1026–27.

12. *Id.* at 1027.

13. *Id.* (quoting Restatement (Second) of Contracts § 209 (1981)).

14. *Bullfrog Marina, Inc. v. Lentz*, 28 Utah 2d 261, 501 P.2d 266, 270 (1972) (emphasis added).

15. *Id.*

16. *Ford v. Am. Express Fin. Advisors, Inc.*, 2004 UT 70, ¶ 28, 98 P.3d 15 (quoting *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir.1999)).

dence is appropriately considered, even in the face of a clear integration clause, where the contract is alleged to be a forgery, a joke, a sham, lacking in consideration, or where a contract is voidable for fraud, duress, mistake, or illegality.[17] By their very nature, these bases for invalidation of a contract are not necessarily provable by reference to the contract itself.[18] Moreover, these bases are not necessarily inconsistent with an explicit agreement that a contract constitutes the complete understanding of the parties. In other words, a written contract could purport to constitute the *complete* understanding of the parties, yet nevertheless be *invalid* because it is a forgery, a joke, a sham, or the result of fraud, duress, mistake, or illegality.

¶ 16 Richard's argument that the Lease is not integrated because he and Rodney en-

tered into a separate oral agreement does not present a circumstance under which we allow extrinsic evidence to be considered on the question of integration in the face of a clear integration clause. Richard does not argue that the Lease is complete yet invalid on one of the above-described bases for invalidity. Rather, he argues that it is incomplete because he and Rodney entered into a separate oral agreement either that it was invalid or subject to a condition precedent. To argue that the Lease is not the complete agreement of the parties is to argue in direct contradiction to the clear integration clause. Thus, we will not allow extrinsic evidence of a separate agreement to be considered on the question of integration in the face of a clear integration clause.[19] To the extent any of our prior cases provide otherwise, we overrule those cases.[20]

17. *See Union Bank v. Swenson*, 707 P.2d 663, 665 (Utah 1985); Restatement (Second) of Contracts § 214 cmt. c.

18. *See Union Bank*, 707 P.2d at 665; Restatement (Second) of Contracts § 214 cmt. c ("[I]nvalidating causes need not and commonly do not appear on the face of the writing.").

19. *See, e.g., Howard v. Perry*, 141 Idaho 139, 106 P.3d 465, 467–68 (2005) ("If a written contract is complete upon its face and unambiguous, no fraud or mistake being alleged, extrinsic evidence of prior or contemporaneous negotiations or conversations is not admissible to contradict, vary, alter, add to, or detract from the terms of the contract. A written contract that contains a merger clause is complete upon its face.... The merger clause is not merely a factor to consider in deciding whether the agreement is integrated; it proves the agreement is integrated." (citations omitted)); *UAW–GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 418 (1998) ("[W]hen the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.'" (citation omitted)); *Peterson v. Cornerstone Prop. Dev., LLC*, 2006 WI App 132, ¶ 31, 294 Wis.2d 800, 720 N.W.2d 716 ("The general rule is that when a contract includes an integration clause, evidence of contemporaneous or prior oral agreements relating to the same subject matter are not admissible. In conjunction with the parol evidence rule, an integration clause generally bars the introduction of extrinsic evidence to vary or contradict the terms of a writing. Absent claims of duress, fraud, or mutual mistake, inte-

gration clauses are given effect." (citations, internal quotation marks, and footnote omitted)).

20. One case explicitly states otherwise, while others could be read to suggest otherwise. In *Ringwood v. Foreign Auto Works, Inc.*, 671 P.2d 182 (Utah 1983), we considered whether a written agreement containing a clear integration clause superseded a prior written agreement. We stated that "[i]n determining whether an agreement was intended to supersede a prior agreement, a court may consider extrinsic evidence as to the circumstances of the transaction, including the purpose for which the contested agreement was made." *Id.* at 183. Notwithstanding the integration clause, the trial court admitted extrinsic evidence on the issue and found that the second agreement superseded the prior agreement, and we affirmed. *Id.* at 183–84. Because it was improper for the trial court to consider extrinsic evidence under these circumstances, we overrule this case. We note, however, that under the rule that we articulate today, we would have given effect to the second agreement's integration clause and excluded extrinsic evidence. We therefore would have concluded, as did the trial court, that the second agreement superseded the first.

In *Bullfrog Marina, Inc. v. Lentz* we stated, "Whether a document was or was not adopted as an integration may be proved by any relevant evidence." 28 Utah 2d 261, 501 P.2d 266, 270 (1972). We also stated that "[i]n determining the issue of the completeness of the integration in writing, evidence extrinsic to the writing itself is admissible. Parol testimony is admissible to show the circumstances under which the agreement was made and the purpose for which the instrument was executed." *Id.* We quoted this language in *Eie v. St. Benedict's Hospital*, 638

¶ 17 We therefore disagree, in part, with the court of appeals' assessment of the parol evidence rule. The court of appeals explained that "[a]ny relevant evidence, including parol evidence, is admissible in the preliminary determination of integration" and stated that it was appropriate for the trial court to have considered Richard's testimony regarding the intent of the Lease.[21] We hold today that in the face of a clear integration clause, extrinsic evidence of a separate oral agreement is not admissible on the question of integration. The court of appeals ultimately held, however, that "[t]he Lease is an integrated agreement, against which parol evidence may not be admitted absent some ambiguity in the terms of the Lease." [22] We agree that the Lease is a final and complete expression of Richard and Rodney's bargain; thus, we affirm this holding.

¶ 18 Because the Lease is integrated, we consider the second step in assessing the applicability of the parol evidence rule: whether the terms of the Lease are ambiguous. If the terms are ambiguous, extrinsic evidence is admissible to clarify the meaning of those terms.[23] Neither Richard nor Rodney challenges the Lease's terms as ambiguous. For this reason, we affirm the court of appeals' conclusion that the Lease is unambiguous.[24] The parol evidence rule therefore bars the use of extrinsic evidence to vary or add to the terms of the Lease because it is valid, integrated, and unambiguous.

## CONCLUSION

¶ 19 Extrinsic evidence of a separate oral agreement is not admissible on the question of integration where the contract at issue contains a clear integration clause. Thus, evidence that Richard and Rodney entered into a separate oral agreement that the Lease is invalid or that its effectiveness is subject to a condition precedent was improperly considered by the trial court, given that the Lease contains a clear integration clause. We conclude that the Lease is integrated and that its terms are unambiguous. Thus, the parol evidence rule bars the admission of all extrinsic evidence regarding the Lease. Affirmed.

¶ 20 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.

P.2d 1190, 1194 (Utah 1981), and *Spears v. Warr*, 2002 UT 24, ¶ 19, 44 P.3d 742. And in *Hall v. Process Instruments & Control, Inc.* we cited *Eie* for the proposition that "[a]ll relevant evidence is admissible to prove integration." 890 P.2d 1024, 1028 (Utah 1995). None of the contracts at issue in these cases included an integration clause. Thus, we were not presented with the issue we face in this case: whether extrinsic evidence of a separate oral agreement regarding the contract is admissible in the face of a clear integration clause. To the extent our statements in *Bullfrog Marina, Inc.*, *Eie*, *Spears*, and *Hall* suggest that extrinsic evidence of a separate oral agreement *is* admissible where the contract contains a clear integration clause, we disavow them.

Finally, in *Union Bank* we stated as follows:
Protection against judicial enforcement of writings that appear to be binding integrations but in fact are not lies in the provision that all relevant evidence is admissible on the threshold issue of whether the writing was adopted by the parties as an integration of their agreement. This appears to be so even if the writing clearly states it to be a complete and final statement of the parties' agreement.
707 P.2d at 665. This statement is properly understood in the context of the discussion in which it is found–a discussion explaining that extrinsic evidence is admissible on the question of integration when a written agreement is alleged to be invalid. *See id.* But if read in isolation, this statement could suggest that extrinsic evidence is *always* admissible on the question of integration. Such a reading of this statement is inaccurate, and one that we disavow.

21. *Tangren Family Trust v. Tangren*, 2006 UT App 515, ¶¶ 7, 9, 154 P.3d 180.

22. *Id.* ¶ 9.

23. *See Hall*, 890 P.2d at 1026–27.

24. *Tangren Family Trust*, 2006 UT App 515, ¶ 11, 154 P.3d 180.