**2017 UT App 213**

# THE UTAH COURT OF APPEALS

FAR WEST BANK,
Appellee,
*v.*
MIKE L. ROBERTSON,
Appellant.

Opinion
No. 20150513-CA
Filed November 16, 2017

Fourth District Court, Provo Department
The Honorable David N. Mortensen
No. 110402516

Mike L. Robertson, Appellant Pro Se

Steven W. Call and Jonathan A. Dibble, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred.[1]

ORME, Judge:

¶1     Following a trustee's sale, Appellee Far West Bank[2] initiated this action to obtain a deficiency judgment against pro se Appellant Mike L. Robertson, the sole debtor under a note

---

1. Judge J. Frederic Voros Jr. participated in this case as a member of the Utah Court of Appeals. He retired from the court before this decision issued.

2. While this appeal was pending, Far West's parent company, AmericanWest Bank, merged with Banner Bank, at which time Far West ceased doing business in Utah. Nevertheless, for the sake of convenience we refer to Appellee as "Far West."

that was foreclosed nonjudicially. Robertson asserted several counterclaims, and the parties filed cross-motions for summary judgment. Ruling in favor of Far West, the district court dismissed Robertson's counterclaims and found him liable for a deficiency, leaving the issue of the trust property's fair market value to be resolved at trial. Ultimately, the court found that Far West's credit bid at the trustee's sale exceeded the fair market value of the trust property, thus entitling Far West to a deficiency judgment for the difference between the amount bid and the amount owed. Robertson now appeals, challenging the district court's decision on summary judgment and arguing that it abused its discretion by excluding the testimony of his appraiser. We affirm and remand for the limited purpose of calculating Far West's attorney fees reasonably incurred on appeal.[3]

## BACKGROUND[4]

¶2     On August 21, 2006, Robertson signed a promissory note (the First Note) in favor of Far West for a $230,000 revolving line of credit, which Robertson used to fund a business venture. While there is some dispute as to precisely which financial services were offered and when, the relevant details are clear enough. On that same day in August 2006, Robertson, as general partner of Round Peak Natural Seed Farms, Ltd., executed a deed of trust with a power of sale provision (the First Trust

---

3. Since we affirm the district court's judgment in Far West's favor, Far West's motion to strike portions of Robertson's reply brief is moot.

4. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (citation and internal quotation marks omitted).

Deed) in favor of Far West as security for the First Note. A few months later, the parties agreed to modify the note by raising the credit line from $230,000 to $500,000.

¶3      Robertson signed a second promissory note (the Second Note) in favor of Far West on September 12, 2007, this time for a revolving credit line capped at $250,000. As security for the Second Note, Robertson, once again acting as general partner of Round Peak, provided Far West with a second deed of trust (the Second Trust Deed), which also contained a power of sale provision. The First and Second Trust Deeds (together, the Trust Deeds) each encumbered the same real property (the Property).

¶4      On February 19, 2009, Far West mailed Robertson a letter informing him that both notes were in default. Hoping to restructure the debt, Robertson initiated a series of negotiations with Far West that continued through May 1, 2009, on which date the parties finally signed an agreement. Under that agreement, Robertson would consolidate his debt under the First and Second Notes by signing a third note (the Consolidated Note) in the principal amount of $669,726.32 and an attendant loan agreement (the Consolidated Loan Agreement). The parties further agreed that the Consolidated Note would be secured by the Trust Deeds. Finally, the Consolidated Note and the Consolidated Loan Agreement each contained a clause stating that the instrument itself, together with the "loan documents" and the "related loan documents," were to be the final expression of the parties' agreement.

¶5      Less than two years later, Robertson again began missing payments. On January 13, 2011, the successor trustee (the Trustee)[5] recorded notices of default under both Trust Deeds. When more than three months passed without any sign from

---

5. Far West appointed Steven W. Call as successor trustee under the Second Trust Deed on January 7, 2011. It appointed Call as successor trustee under the First Trust Deed a few days later.

Robertson of an intent to cure, the Trustee proceeded with the nonjudicial foreclosure process by recording a notice of trustee's sale for each of the Trust Deeds. The two notices of sale (together, the Notices of Sale) contained identical property descriptions, both of which were identical to the property descriptions contained in the notices of default. Robertson was timely served with each notice of default and notice of sale.

¶6    On June 1, 2011, Far West purchased the Property at the Trustee's sale for a total of $403,000, having credit-bid $268,000 on the First Trust Deed and $135,000 on the Second Trust Deed. Far West then commenced this action against Robertson for a deficiency judgment, alleging that its combined credit bids amounted to a sum greater than the fair market value of the Property but less than the amount owed.

¶7    Although Robertson had not sought any kind of relief in the district court prior to the Trustee's sale, his answer to Far West's complaint included a host of counterclaims, including claims for breaches of contract and the implied covenant of good faith and fair dealing.[6] In support of his counterclaims, Robertson alleged not only that the Trustee's sale had been conducted in an unlawful manner, but also that the foreclosure process had been unlawful at its inception, as any default on his part was directly attributable to Far West's intentional, substantial breach of what he referred to as the parties' "ACH Agreement."

¶8    Elaborating on the latter claim, Robertson alleged that in the course of the parties' negotiations in connection with the First Note, Far West had granted him permission to initiate electronic credit and debit entries to Far West accounts for the purpose of facilitating electronic payments in connection with his business. While the loan documents relating to the First Note

---

6. Robertson abandoned his remaining counterclaims on appeal. Accordingly, we do not address them.

make no mention of this Automated Clearinghouse Agreement (the ACH Agreement),[7] Robertson maintained that both parties had always understood the service to be integral to the operation of his business and to their contractual relationship. In response, Far West admitted that indeed it did sign an "ACH Origination Agreement" (the Origination Agreement), but not until much later, on October 14, 2008, as a separate agreement unrelated to the First and Second Notes. The Origination Agreement, which Robertson admits to signing in 2008, does not reference any business loan or trust deed; it does, however, provide that either party may terminate the agreement on ten days' notice. In any event, according to Robertson, the Origination Agreement had little practical effect other than to reaffirm the terms of what he insists was the parties' existing ACH Agreement.

¶9      Having argued that the ACH Agreement lay at the center of the parties' contractual relations from the beginning, Robertson alleged that Far West unilaterally terminated the ACH service on September 22, 2010, and, by doing so, breached the Consolidated Loan Agreement and intentionally rendered his continued performance under the Consolidated Note "impossible."[8] Refining this argument on summary judgment,

---

7. "The automated clearinghouse (ACH) system is a nationwide network through which depository institutions send each other batches of electronic credit and debit transfers. The direct deposit of payroll, social security benefits, and tax refunds are typical examples of ACH credit transfers." Automated Clearinghouse Services, Board of Governors of the Federal Reserve System (May 16, 2016), http://www.federalreserve.gov/paymentsystems/fedach_about.htm [https://perma.cc/8TH3-WRHW].

8. For purposes of its motion for partial summary judgment, Far West stipulated that Robertson did not begin missing payments on the Consolidated Note until after Far West had terminated the Origination Agreement.

Robertson produced evidence that Far West had already terminated its ACH services once before, following his default on the First Note and the Second Note, but had agreed to resume the services on the condition that Robertson sign the Consolidated Note. Accordingly, Robertson argued that, while neither the Consolidated Note nor the attendant Consolidated Loan Agreement made any mention of ACH services, there remained a genuine issue of fact as to whether the parties intended to include those services as a term of their final agreement in 2009. He maintained that if the services were included, then Far West's act of termination in September 2010 amounted to substantial breach, excusing his continued performance under the Consolidated Note. The evidentiary lynchpin in Robertson's argument is an email from his loan officer, dated April 30, 2009, which reads, "Mike, [u]pon completion of the new loan documentation, we will reinstate your ACH line."

¶10    Upon consideration of the summary judgment motions filed by both parties, the district court ruled in favor of Far West, granting partial summary judgment on its deficiency claim and dismissing each of Robertson's counterclaims with prejudice. With respect to the former, the court concluded that Far West was entitled to any deficiency that might remain owing on the Consolidated Note because "[t]he foreclosures of the Trust Deeds were lawfully conducted in compliance with . . . Utah law." With respect to Robertson's contract counterclaims, the court concluded that it could resolve the relevant issues without deciding whether the Consolidated Note and the Consolidated Loan Agreement comprised a complete integration, meaning the alleged ACH provision was of no effect.[9] Instead, it reasoned

---

9. As discussed below, our Supreme Court has defined an "integration" as "'a writing or writings constituting a final expression of one or more terms of an agreement.'" *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 12, 182 P.3d 326 (quoting *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1027

(continued…)

that even if Far West was obligated to provide ACH services in connection with the loan, Robertson had produced no evidence that the loan officer intended to "reinstate" any agreement other than the Origination Agreement, and it stated that

> [t]he [Origination Agreement] unequivocally provided that either party could cancel the agreement with[] ten . . . days' notice. The facts are undisputed that Far West gave more than twenty . . . days' notice of cancellation of the [Origination Agreement] to . . . Robertson and therefore Far West fully complied with [its] terms . . . .[10]

---

(…continued)

(Utah 1995)). Further, the Court has explained that once a writing evidencing a contract is deemed integrated, parol evidence—that is, "'evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an *integrated* contract'"—is inadmissible. *Id.* ¶ 11 (emphasis in original) (quoting *Hall*, 890 P.2d at 1026).

10. To the extent Robertson claims the district court improperly "weighed the evidence and made a finding of fact" that the parties intended the Consolidated Note and the Consolidated Loan Agreement to be an integration, he misstates the record. While the court may have offhandedly referred to the Origination Agreement as "parol evidence" during the summary judgment hearing, it adopted no such language in its final order. Rather, the court's conclusion that Robertson's contract counterclaims should be dismissed was predicated solely on the basis of the court's determinations that Far West had lawfully foreclosed the Trust Deeds and that it had "complied with the termination terms of the [Origination Agreement]" when terminating its ACH services. But in any event, as we discuss below, the district court would have been justified in concluding

(continued…)

¶11    Having resolved all issues of liability on summary judgment, the court scheduled a trial for July 2, 2013, to address the narrow questions of "the balance owing under the [Consolidated Note]" and "the fair market value of the [Property]" as of the date of the Trustee's Sale.[11] At trial, Far West called Robertson's loan officer and an appraiser to testify as to each issue, respectively. For his part, Robertson testified on his own behalf, claiming that Far West had credit-bid a sum substantially lower than the Property's value. He also sought to introduce the testimony of his own appraiser. The court excluded that testimony, however, as Robertson had failed to identify the witness prior to trial.

¶12    Following trial, the district court found that the balance owed under the Consolidated Note was $693,513.97, the sale price was $403,000, and the fair market value of the Property was $340,000. Accordingly, because "the fair market value of the [P]roperty . . . at the time of the foreclosure sales was less than the $403,000 amount [that Far West] credit bid," the court fixed the deficiency judgment in the amount of the difference between what was owed and what was bid.

¶13    Robertson moved for a new trial under rule 59 of the Utah Rules of Civil Procedure. His motion was denied, and he now appeals.

---

(…continued)
that the Consolidated Note and the Consolidated Loan Agreement were an integration as a matter of law.

11. Section 57-1-32 of the Utah Code provides that a "court may not render judgment for more than the amount by which the amount of the indebtedness with interest, costs, and expenses of sale, . . . exceeds the fair market value of the property as of the date of the sale." Utah Code Ann. § 57-1-32 (LexisNexis 2010).

ISSUES AND STANDARDS OF REVIEW

¶14    Although in his brief Robertson articulates six separate issues for our consideration on appeal, he essentially argues that the district court committed three errors. First, Robertson contends that the district court erred by dismissing his counterclaims for breaches of contract and the implied covenant of good faith and fair dealing. Second, he maintains that the court erred by granting partial summary judgment on Far West's claim for a deficiency. Finally, Robertson argues that the court erred at the trial stage by excluding the testimony of his appraiser.

¶15    We review the district court's "ultimate grant or denial of summary judgment for correctness." *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 9, 284 P.3d 630 (citations and internal quotation marks omitted). "We give no deference to the district court's legal conclusions and consider whether the court correctly decided that no genuine issue of material fact existed." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 15, 390 P.3d 314 (citation and internal quotation marks omitted).

¶16    Our review of the district court's decision on summary judgment requires us to review the court's interpretation of the parties' written agreements. "The interpretation of a contract is a question of law, which we review for correctness, giving no deference to the ruling of the [trial] court." *McNeil Engineering & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 7, 268 P.3d 854 (alteration in original) (citation and internal quotation marks omitted).

¶17    We review the district court's decision to exclude the testimony of Robertson's appraiser under a "bifurcated standard." *See Glacier Land Co. v. Claudia Klawe & Assocs., LLC*, 2006 UT App 516, ¶ 13, 154 P.3d 852. "[T]o the extent the issue on appeal required the trial court to interpret rules of civil procedure, it presents a question of law which we review for correctness." *Id.* (citation and internal quotation marks omitted).

However, the court's decision to impose sanctions, such as the exclusion of evidence under rule 37 of the Utah Rules of Civil Procedure, is reviewed for abuse of discretion. *Id.*

ANALYSIS

¶18   We begin by reviewing the district court's order denying Robertson's motion for summary judgment and granting Far West's cross-motion for summary judgment on each of Robertson's counterclaims. We then review the court's decision granting partial summary judgment on Far West's claim for a deficiency judgment. We conclude by considering Robertson's challenge to the court's decision excluding the trial testimony of his appraiser.

I. Robertson's Counterclaims

¶19   Robertson contends that the district court erred when it dismissed his counterclaims for breaches of contract and the implied covenant of good faith and fair dealing. We hold that the district court properly dismissed the counterclaims.

A.      Robertson's Counterclaim for Breaches of Contract

¶20   Quoting our Supreme Court's decision in *Bullfrog Marina, Inc. v. Lentz*, 501 P.2d 266 (Utah 1972), Robertson maintains that his counterclaim should have survived summary judgment under the rule that

> where two or more *instruments* are executed by the
> same parties contemporaneously, or at different
> times in the course of the same transaction, and
> concern the same subject matter, they will be read
> and construed together so far as determining the
> respective rights and interests of the parties,
> although they do not in terms refer to each other.

*Id.* at 271 (emphasis added). Robertson contends that, given the alleged centrality of Far West's ACH services to the parties' contractual relationship, under the rule in *Bullfrog Marina* there remains a genuine issue of fact as to whether the Consolidated Note and the Consolidated Loan Agreement should be "read and construed together" with his loan officer's emailed promise to "reinstate [the] ACH line." The issue is material, he argues, because if the loan officer's promise to provide ACH services was an essential term of the parties' final agreement, then not only might Far West's termination of the service have excused him from making further payments under the Consolidated Note, but Far West could well be liable to him for any resulting damages. *See Jackson v. Rich*, 499 P.2d 279, 280–81 (Utah 1972) ("'As a rule, a party first guilty of substantial or material breach of contract cannot complain if the other party thereafter refuses to perform. . . . It has also been said that where a contract is not performed, the party who is guilty of the first breach is generally the one upon whom rests all the liability for the nonperformance.'") (quoting what is now 17 Am. Jur. 2d *Contracts* § 589 (2016)). Accordingly, Robertson maintains that the district court's dismissal of his counterclaim was premature.

¶21    We agree that, as a general proposition, the question of whether the parties to a contract intended that a particular document or set of documents should be deemed to contain the final and complete expression of their agreement is a question of fact and, thus, often cannot be resolved on summary judgment. *See City of Grantsville v. Redevelopment Agency*, 2010 UT 38, ¶¶ 24, 29, 233 P.3d 461. Nevertheless, we take issue in two respects with Robertson's line of reasoning. First, unlike the commercial lease and employment contract at issue in *Bullfrog Marina*, it is unlikely that the email Robertson received from his loan officer rose to the level of formality characteristic of an "instrument"— the operative term used in *Bullfrog Marina*. *See Instrument*, Black's Law Dictionary (9th ed. 2009) ("A written legal document that defines rights, duties, entitlements, or liabilities, such as a contract[.]"). Second, and more importantly,

Robertson's reliance on *Bullfrog Marina* is at odds with the Utah Supreme Court's more recent jurisprudence on the doctrine of integration.

¶22    An "integration," our Supreme Court has explained, is "'a writing or writings constituting a final expression of one or more terms of an agreement.'" *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 12, 182 P.3d 326 (quoting *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1027 (Utah 1995)). The effect is that once a document or set of documents is deemed an integration, under the parol evidence rule "'evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of [the] integrated contract'" is inadmissible. *Id.* (emphasis omitted) (quoting *Hall*, 890 P.2d at 1026). Prior to the Court's decision in *Tangren*, trial courts were essentially required to determine "as a question of fact" whether the parties adopted a writing or writings as an integration "[w]henever a litigant . . . ask[ed for] the application of the parol evidence rule." *Bullfrog Marina*, 501 P.2d at 266.

¶23    In *Tangren*, however, the Court expressly disapproved of its previous decision in *Bullfrog Marina* because that decision permitted the admission of "any relevant evidence" to prove that a document was not intended to be an integration. *Tangren*, 2008 UT 20, ¶ 16 & n.20. The Court held in *Tangren* that, contrary to the rule it articulated in *Bullfrog Marina*, trial courts "will not allow extrinsic evidence of a separate agreement to be considered on the question of integration in the face of a clear integration clause." *Id.* ¶ 16.

¶24    We conclude that Robertson's counterclaim for breach of contract was properly dismissed on summary judgment under the *Tangren* rule. Because the Consolidated Note and the Consolidated Loan Agreement each contained an integration clause, Robertson was precluded from introducing evidence that the documents referred to in those clauses did not fully and finally express the parties' agreement. Thus, the email from Robertson's loan officer was incapable of raising a genuine issue

of fact as to the question of integration as a matter of law, and Far West was entitled to the benefit of the parol evidence rule on summary judgment.

¶25 We do observe that under the facts in the instant case, the rule in *Tangren* does not lend itself to an altogether straightforward application. Specifically, we acknowledge that the instruments' integration clauses state that the parties' final expression of their agreement was not restricted to the four corners of the instruments themselves, but also included certain additional, unspecified "loan documents" and "related loan documents." Therefore, as a factual matter, it is not inconceivable that the Origination Agreement—which, after all, Far West does admit to signing—could be one of the loan documents referred to.[12] But as the district court recognized, this factual issue, while material to the question of integration, is nevertheless immaterial to the ultimate question of Far West's alleged breach. Even if Far West was bound by the terms of the Origination Agreement, it is undisputed that it complied with those terms when it terminated its ACH services in September 2010. Thus, even if we assume that the Origination Agreement was incorporated into the parties' final agreement given the phraseology of the integration clause, the dismissal of

---

12. Neither the Consolidated Note nor the Consolidated Loan Agreement defines the terms "loan documents" or "related loan documents," but the Consolidated Loan Agreement defines "Loan," with our emphasis, as "any and all loans *and financial accommodations* from Lender to Borrower *whether now or hereafter existing*, and however evidenced." It further defines "Related Documents"—again with our emphasis—as "all promissory notes, credit agreements, loan agreements, . . . and *all other instruments, agreements and documents*, whether now or hereafter existing, executed in connection with the Loan."

Robertson's counterclaim would still be appropriate on summary judgment.[13]

---

13. Robertson also argues, in the alternative, that if the Origination Agreement was integrated into the terms of the Consolidated Note and the Consolidated Loan Agreement, then we should hold that the parties' entire agreement was void ab initio for want of consideration. Quoting our Supreme Court's decision in *Resource Management Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028 (Utah 1985), Robertson contends that including a provision for termination on ten days' notice is tantamount to reserving an "arbitrary right to terminate the contract." *Id.* at 1037. But the Court in *Resource Management* did not comment on the enforceability of a notice-termination provision, *see id.*, and Robertson does not adequately explain why the principle articulated in that case should have any application to the facts of this case. In actuality, it does not. As neither Robertson nor Far West was permitted to terminate the Origination Agreement except upon ten days' notice, the terms of the Origination Agreement were at all times binding upon both parties for a period of at least ten days. Furthermore, the Origination Agreement expressly provided that Far West must fully process any ACH transaction that Robertson might initiate prior to either party's giving notice of its intent to terminate. Finally, courts in other states have uniformly held that the right to terminate a contract on a specified notice period does not render a contract void for lack of consideration. *See, e.g., Goff v. Massachusetts Protective Ass'n*, 176 N.W.2d 576, 579 (Wis. 1970) ("[The fact that] both parties had a right on 30-days' notice to terminate the agreements does not render the contracts lacking in mutuality . . . of consideration[.]"). *See also, e.g., Strobe v. Netherland Co.*, 283 N.Y.S. 246, 253 (App. Div. 1935) (explaining that, where an employer reserves the right to terminate the employment contract upon thirty days' notice, the contract is "binding for thirty days at least" and is thus not void for lack of consideration).

¶26     On the other hand, what clearly does *not* fall within the ambit of "loan documents" or "related loan documents," as those terms appear in the instruments' integration clauses, is the email Robertson received from his loan officer the day before the Consolidated Note and Consolidated Loan Agreement were signed. Apparently hoping to smuggle an additional ACH term into the parties' deal apart from the arrangement provided in the Origination Agreement, Robertson argues that the loan officer's email, which promised to "reinstate [the] ACH line" once the instruments had been signed, was included among the "loan documents" referred to in the integration clauses and "constituted everything the parties had bargained for[.]" We hold that, on the contrary, the parol evidence rule bars Robertson from using the email to graft an ACH term, separate from the arrangement in the Origination Agreement, into the parties' bargain.[14] *See Tangren*, 2008 UT 20, ¶ 11 (quoting *Hall*,

---

14. Likewise, we reject the argument that the loan officer's email had the effect of modifying the Origination Agreement. Robertson contends that, even if we conclude the Origination Agreement was the sole source of any obligation Far West had to provide ACH services under the parties' arrangement, nevertheless a triable factual issue remains as to whether the loan officer's email effectively modified the Origination Agreement by excising its permissive termination term. It is unclear how the loan officer's bare promise to "reinstate [the] ACH line" could have accomplished this feat. And Robertson's scant reasoning does little to illuminate matters. In any event, Robertson's argument fails because it relies on parol evidence to add to the terms of the Consolidated Note and the Consolidated Loan Agreement. Even assuming that the Origination Agreement was incorporated into the Consolidated Note and the Consolidated Loan Agreement by means of those instruments' integration clauses, the loan officer's email remains inadmissible to vary the terms contained in any document so incorporated, including the Origination Agreement. Thus, because Robertson has produced no competent evidence raising a genuine issue of

(continued…)

890 P.2d at 1026) (explaining that "parol evidence" is "'evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of [the] contract'"). If, when drafting the Consolidated Note and the Consolidated Loan Agreement, the parties had indeed intended that the emails they exchanged in the days leading up to the date those instruments were signed should be included within the sweep of the instruments' integration clauses along with "loan documents" and "related loan documents," undoubtedly they would have made this explicit.[15]

---

(…continued)

fact as to whether the Origination Agreement was modified, his contention was properly rejected on Far West's motion for partial summary judgment. *See Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 31, 54 P.3d 1054 ("[O]nce the moving party [who does not bear the burden of proof on the challenged claim at trial] challenges an element of the nonmoving party's case on the basis that no genuine issue of material fact exists, the burden then shifts to the nonmoving party to present evidence that is sufficient to establish a genuine issue of material fact.").

15. Robertson raises yet another argument aimed at circumventing the Origination Agreement's termination provision by characterizing the loan officer's email as a new "offer" to provide ACH services apart from the Origination Agreement, which Robertson then "accepted" the next day by signing the Consolidated Note and the Consolidated Loan Agreement. But Robertson's characterizations do not withstand even superficial scrutiny. "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995). Robertson maintains that a triable issue exists as to whether an objective, reasonable person, upon finding that Robertson had signed the Consolidated Note and

(continued…)

¶27 Accordingly, we hold that since the Consolidated Note and the Consolidated Loan Agreement each contained an integration clause, and since the statements contained in the loan officer's email did not fall within the scope of those clauses, the parol evidence rule precluded Robertson from producing evidence of any ACH term outside the Origination Agreement. We therefore hold that the district court correctly dismissed Robertson's counterclaim for breach of contract on summary judgment.

B.      Robertson's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing

¶28 Robertson also contends that the district court erred in dismissing his claim for breach of the implied covenant of good faith and fair dealing. We conclude that it did not.

¶29 Inherent in every contract is "[a]n implied covenant of good faith and fair dealing." *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193. Under the covenant, "both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Id.* "However, we will not interpret the implied

---

(…continued)
the Consolidated Loan Agreement, would be justified in understanding that Robertson had manifested assent to an offer from his loan officer on behalf of Far West to provide ACH services independent of the Origination Agreement. The problem, however, is that the Consolidated Note and the Consolidated Loan Agreement *make no mention whatsoever of ACH services*. We hold, without hesitation, that no reasonable person could conclude that an enforceable contract to provide ACH services was created on the basis of a document that on its face has nothing at all to do with ACH services. Accordingly, Robertson has failed to raise a triable issue of fact capable of surviving summary judgment.

covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves." *Brown v. Moore*, 973 P.2d 950, 954 (Utah 1998).

¶30    The covenant of good faith and fair dealing is subject to several well-established limiting principles. One is that the covenant "cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante." *Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). Another is that the covenant "cannot create rights and duties inconsistent with express contractual terms." *Oakwood Village*, 2004 UT 101, ¶ 45. *See Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 505 (Utah 1980). A third is that courts "will not use [the] covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract." *Oakwood Village*, 2004 UT 101, ¶ 45. *See Dalton v. Jerico Constr. Co.*, 642 P.2d 748, 750 (Utah 1982).

¶31    With these limiting principles in mind, we can dispose of Robertson's claim of error in short order. Robertson complains in his brief that his "whole purpose" for seeking a loan from Far West in the first instance "was to obtain ACH services for his business" and that he "relied upon the funds generated from the ACH Agreement" to make his payments. Whether or not these assertions are true, they are insufficient to state a claim. Even if we assume that Far West was obligated to provide ACH services in connection with the Consolidated Note, we have already determined that the obligation derived from no source other than the Origination Agreement. Thus, because Robertson does not dispute that Far West complied with the Origination Agreement's terms when it terminated its ACH services, his claim fails because the covenant he invokes "cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante." *Oakwood Village*, 2004 UT 101, ¶ 45. Accordingly, we hold that the district court properly dismissed Robertson's good-faith-and-fair-dealing counterclaim on summary judgment.

II. Far West's Deficiency Claim—The Validity of the
Trustee's Sale

¶32    Robertson next contends that, regardless of whether his counterclaims were properly dismissed, the district court's decision granting partial summary judgment on Far West's deficiency claim should be reversed because the Trustee's sale was conducted in an unlawful manner. Robertson advances two grounds for this contention. First, he argues that the district court wrongly concluded that the Trustee's Notices of Sale complied with section 57-1-25(1) of the Utah Code. *See generally* Utah Code Ann. § 57-1-25(1) (LexisNexis 2010). Second, he argues that the district court erred when it did not find that a genuine issue of fact existed as to whether the Trustee timely received Robertson's request for a payoff statement. *See id.* § 57-1-31.5(2). We address each of these arguments in turn.

A.    Validity of the Trustee's Sale

¶33    Robertson argues, first, that the Trustee's Notices of Sale were deficient under section 57-1-25(1) because they failed to "particularly describ[e] the property to be sold." *See id.* § 57-1-25(1). In so arguing, he does not dispute that the Notices of Sale included an accurate metes-and-bounds description of the Property. In fact, he appears to concede that if the Trustee had stopped there, the property description would have been entirely sound. The problem, Robertson maintains, is that the Trustee went one step further to include, in addition to the metes and bounds of the Property, a single tax identification number (TIN). While a TIN is usually a matter of interest only to the taxpayer and the tax collector, Robertson argues that the Trustee's decision to include only one of those TINs "cause[d] great confusion, which resulted in a [chilling] of the bidding process" because the Property was comprised of four individual parcels of land, each of which has a unique TIN.

¶34    Robertson's point is not wholly without merit. Citing evidence from the record, he observes that the TIN that made its

way into the Notices of Sale belongs to what was very likely the least valuable of the four parcels. Robertson illustrates the issue by posing the following hypothetical: Suppose that the Trustee were instead trying to sell four houses on contiguous parcels that together comprised a single neighborhood block. Under such circumstances, even if the Trustee were to provide potential buyers with the metes and bounds of the block, it would be odd—and perhaps suspicious—if he were to include in his notice of sale the address of only the least valuable of the four individual houses.[16]

¶35    Nevertheless, while we agree that the Trustee's action likely did not comport with best practices, it is unnecessary to reach the question of whether the Notices of Sale were sufficient under the legal standard of section 57-1-25(1). We hold that Far West was entitled to judgment as a matter of law regardless of the Notices' legal sufficiency because, once the sale had been completed, Robertson was required to adduce evidence of both defect *and prejudice* to assert a successful defense.[17]

---

16. Of course, the analogy is far from perfect. The street address of a residential property is a much more meaningful identifier of real property for prospective buyers than a TIN. The one is readily discernible from the street; the other is little more than an invitation to review records at the county offices. The property description of importance is the legal description—in this case, the metes-and-bounds description set out in the Notices of Sale. Among serious potential buyers of property, the legal description is the one that matters, even though a sophisticated buyer will no doubt make inquiry if the legal description appears to cover more ground than a street address or TIN also included in a notice of sale.

17. When reviewing a summary judgment decision, we are free to affirm on legal ground other than those adopted by the

(continued…)

¶36 "Unless there is evidence of fraud or other unfair dealing," a trustee's sale once accomplished will not be set aside unless the trustor can "show he suffered prejudice from some defect in the sale." *Bank of America v. Adamson*, 2017 UT 2, ¶ 23, 391 P.3d 196. This is because "'the need for finality is at its apex'" when "'title to real property is at issue,'" *id.* ¶ 17 (quoting *American Estate Mgmt. Corp. v. International Inv. & Dev. Corp.*, 1999 UT App 232, ¶ 10, 986 P.2d 765), and thus, in most cases the proper time for a trustor to assert his rights is before the trustee's sale has taken place, *id.* ¶ 16. Furthermore, a trustor "seek[ing] to have a trustee sale set aside for irregularity, want of notice, or fraud has the burden of proving his contention" because, absent "evidence to the contrary," courts will "presume[] . . . that the sale was regular." *Concepts, Inc. v. First Sec. Realty Services, Inc.*, 743 P.2d 1158, 1159 (Utah 1987).

¶37 In view of these principles, any notice-of-sale irregularities a trustor may allege in opposition to a trustee's summary judgment motion in a post-sale deficiency action are immaterial if the trustor "does not demonstrate that . . . [there was] a resulting 'effect of chilling the bidding *and causing an inadequacy of price.*'" *Timm v. Dewsnup*, 2003 UT 47, ¶ 37, 86 P.3d 699 (emphasis added) (quoting *Concepts*, 743 P.2d at 1159). *See Gilroy v. Ryberg*, 667 N.W.2d 544, 558 (Neb. 2003) ("If the defect did not result in a reduced sales price, courts have refused to set aside the sale."). *See also Adamson*, 2017 UT 2, ¶ 24 (citing *Gilroy* with approval). *Cf. Jones v. Johnson*, 761 P.2d 37, 41 n.2 (Utah Ct. App. 1988) ("In both [judicial and nonjudicial] foreclosures[,] '*substantial inadequacy of price*, coupled with fraud, mistake, or other unfair dealing' can be the basis for setting aside a foreclosure sale.") (emphasis added) (quoting *First Nat'l Bank v. Haymond*, 57 P.2d 1401, 1405 (Utah 1936)).

---

(…continued)
district court. *See RJW Media, Inc. v. CIT Group/Consumer Finance, Inc.*, 2008 UT App 476, ¶ 36, 202 P.3d 291.

¶38    It is undisputed that Robertson did not raise his dissatisfaction with the Trustee's description of the Property until after the Trustee's sale had been completed. Therefore, to defeat Far West's motion for partial summary judgment by challenging the sufficiency of the Notices of Sale, it was incumbent upon him to offer up more than mere speculative, unsubstantiated allegations that the bidding process was chilled. Rather, Robertson was required to demonstrate that there existed a triable issue of fact as to whether he was prejudiced by an inadequate sale price—a formidable burden where, as here, the sale price *exceeded* the fair market value of the Property. *See Timm*, 2003 UT 47, ¶ 37. But in any event, Robertson failed to allege any facts that would support a finding of prejudice.[18]

¶39    Because Robertson has not demonstrated that the claimed flaw in the Notices of Sale resulted in the Trustee receiving a price for the Property that was lower than what would have been received without the flaw, it makes no difference whether the property description in the Notices satisfied the legal standard of section 57-1-25(1). There being no genuine issue of material fact as to whether Robertson was prejudiced by the Trustee's sale, the district court did not err by granting partial summary judgment in favor of Far West.

B.    Payoff Statement Request

¶40    Robertson next contends that partial summary judgment in Far West's favor was inappropriate because a genuine issue of fact exists as to whether the Trustee failed to respond to his timely request for a payoff statement. Section 57-1-31.5(2) of the Utah Code provides that "[a]n interested party may submit a written request to a trustee for a statement of the amount

---

18. Of course, if Robertson had raised his objections to the Notices of Sale with the district court *before* the Trustee's sale, and had the district court required that corrected Notices of Sale be recorded, this problem would have been entirely avoided.

required . . . to pay off a loan secured by a trust deed." Utah Code Ann. § 57-1-31.5(2)(a)(i) (LexisNexis 2010). It further provides that "[a] request for a payoff statement is not timely unless the trustee receives the request at least 10 business days before the trustee's sale," *id.* § 57-1-31.5(2)(a)(ii)(B), and that "[i]f, after scheduling a trustee's sale, the trustee fails to provide a requested payoff statement[,] the trustee shall . . . cancel the trustee's sale . . . or . . . postpone the trustee's sale," *id.* § 57-1-31.5(2)(c)(ii). Robertson contends that he raised a triable issue of fact regarding whether the Trustee received a payoff request at least ten days prior to the Trustee's Sale, that is, by May 18, 2011.

¶41    As an initial matter, we take note of what Robertson has not alleged, namely, that he had access to funds sufficient to cure the default or that he made any offer to cure the default. "Generally, '[a]n unconditional tender of performance in full by [the trustor,] even if rejected by the [trustee], . . . if kept good has the effect of performance'" and will justify setting aside a trustee's sale. *Capri Sunshine, LLC v. E & C Fox Invs., LLC*, 2015 UT App 231, ¶ 15, 366 P.3d 1214 (first alteration in original) (quoting Restatement (Third) of Property: Mortgages § 6.4(g) (Am. Law Inst. 1997)). But "simply indicating a willingness to pay without tendering payment is insufficient for performance," *id.*, and we have upheld the dismissal of a complaint seeking to set aside a trustee's sale for inadequate compliance with section 57-1-31.5 where the trustor did not "actually offer[] or tender[] payment to cure the default." *Id.* We also observed in *Capri Sunshine* that, like here, the trustor "failed to demonstrate . . . that a violation of [section 57-1-31.5] would support setting . . . [a completed] trustee's sale aside." *Id.* ¶ 26.

¶42    Notwithstanding these considerations, we conclude that Robertson's section 57-1-31.5 defense was properly rejected by the district court on summary judgment because Robertson failed to produce evidence sufficient to raise a genuine issue of material fact. At the relevant time, "Utah Rule of Civil Procedure 56(c) specifically list[ed] the materials that [could] be placed before the court in a summary judgment action." *White Pine*

*Ranches v. Osguthorpe*, 731 P.2d 1076, 1077 (Utah 1986).[19] The rule provided that the "judgment sought shall be rendered if the *pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any*, show that there is no genuine issue as to any material fact." Utah R. Civ. P. 56(c) (2014) (emphasis added). It further provided that "[s]upporting and opposing affidavits . . . shall set forth such facts *as would be admissible in evidence*." *Id.* R. 56(e) (emphasis added). Our Supreme Court has elaborated upon this latter requirement by stating that "[s]ummary judgment may . . . not be denied based solely on inadmissible hearsay" from the non-moving party. *Wayment v. Clear Channel Broadcasting, Inc.*, 2005 UT 25, ¶ 41, 116 P.3d 271.

¶43 Section 57-1-31.5 provides specific rules for determining when a trustee will be deemed to have received a request for a payoff statement. The statute explains that "[a] trustee is considered to have received [a payoff statement request] . . . if . . . the interested party submitted the request through an *approved delivery method* . . . and . . . documentation provided under [that method] indicates that . . . the request was delivered to the trustee[.]" Utah Code Ann. § 57-1-31.5(2)(a)(iv) (emphasis added). Further, it states that an "'[a]pproved delivery method' means delivery by . . . certified or registered United States mail *with return receipt requested*; or . . . a nationally recognized letter or package delivery or courier service . . . that provides a service for . . . *tracking the delivery of an item*; or . . . *documenting . . . that the item was received by the intended recipient*[.]" *Id.* § 57-1-31.5(1)(a) (emphasis added).

---

19. Rule 56 of the Utah Rules of Civil Procedure was amended in 2015 to adopt the language of the corresponding Federal Rule of Civil Procedure. *See Porter v. EB Golf LLC*, 2016 UT App 82, ¶ 7 n.3, 372 P.3d 709. We quote the previous version, as it was the version in effect at the time the motion was argued and decided.

¶44    In support of its motion for partial summary judgment, Far West included an affidavit from the Trustee averring that he never received any payoff statement request from Robertson and that he was never presented with a return receipt requesting his signature in connection with any such request. Thus, to raise a genuine issue of fact capable of precluding summary judgment, it was incumbent upon Robertson to controvert the Trustee's affidavit by pointing to evidence from the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See* Utah R. Civ. P. 56(c). Furthermore, if Robertson elected to oppose Far West's motion with an affidavit of his own, he was limited to "such facts as would be admissible in evidence." *Id.* R. 56(e).

¶45    Robertson failed to produce any evidence of the sort required to demonstrate that he complied with section 57-1-31.5 by sending his request through an "approved delivery method." To support his contention that the Trustee received his request, Robertson relies on the statements of his own trial counsel at the summary judgment hearing and a photocopy of a transaction receipt—not a return receipt—from the United States Postal Service, showing that he mailed something on May 16, 2011. Neither is sufficient to controvert the Trustee's affidavit under rule 56.

¶46    To begin with, the statements of Robertson's trial counsel are not part of the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. Thus, Robertson cannot rely on them to oppose Far West's summary judgment motion. Likewise, the transaction receipt, although attached to Robertson's affidavit, failed to raise a triable factual issue. The affidavit itself asserts only that the request was *mailed*, not that it was actually *received* by the Trustee. Similarly, the transaction receipt is, at best, only evidence that the request was mailed and is legally incapable of establishing the Trustee's receipt of the request. As stated above, under section 57-1-31.5 Robertson was required to request a return receipt when mailing his request or else to use a courier "that provides a service for . . .

documenting . . . that the item was received by the intended recipient." Utah Code Ann. § 57-1-31.5(1)(a) (LexisNexis 2010). Moreover, a trustee is considered to have received a request only if the documentation provided by the chosen courier "indicate[s] that . . . the request was delivered to the trustee[] or . . . delivery of the request was refused." *Id.* § 57-1-31.5(2)(a)(iv). Robertson's receipt does not satisfy these requirements for two reasons. First, the transaction receipt is not a return receipt. And second, the transaction receipt is devoid of any indication that the mail service Robertson utilized would "document[] . . . that the item was received by the intended recipient." *Id.* § 57-1-31.5(1)(a).

¶47   On the latter point, two observations are in order. First, while nearly all the transaction receipt's contents were obviously printed by mechanical means, two brief notes appear to have been scribbled by hand into the receipt's lower left-hand margin. The first reads, "Notice in box: 5-17-2011," and the second reads, "Signed: 5-18-2011." It is impossible to tell who wrote the notes, or when they were written, as they are accompanied by neither a name nor a dated signature. Nor does the form of the receipt provide any clues as to the notes' origin. The notes are not written above any preprinted lines or inside any preprinted boxes. Finally, Robertson, for his part, offers no explanations; he simply points to the May 18 date and asks us to conclude that "[s]omeone with access to the Trustee's certified P.O. Box did in fact receive [his request] and sign[] for it."

¶48   Second, the transaction receipt also contains what purports to be a "Signature Confirmation Number." However, the Trustee's signature is nowhere to be found on the document, and we have been shown no evidence that a separate document with the signature was ever submitted. What the document does contain is a disclaimer, which includes, with our emphasis, the statement that "[a] copy of the recipient's signature will be faxed or mailed *upon request*." Because there is no signature verifying that the Trustee received Robertson's request included anywhere in the record, we must assume no such signature exists. Otherwise, of course, it would have been requested by

Robertson, faxed or mailed to him, and appended to his affidavit.

¶49 Accordingly, Robertson has failed to point to any competent evidence that might raise a genuine issue of fact as to whether, under section 57-1-31.5, the Trustee received his request for a payoff statement. We therefore reject his contention that the district court erred when it concluded that there was no dispute of material fact necessitating a trial on this issue.

## III. The Excluded Testimony

¶50 Robertson contends that the district court erred by excluding the testimony of his appraiser at trial. Again, we disagree.

¶51 Robertson concedes that he did not disclose the identity of the appraiser, whom he attempted to call as a witness, until the morning of trial. Nevertheless, citing rule 26(a)(4)(A) of the Utah Rules of Civil Procedure, he maintains that prior disclosure was not required because he intended to use the witness's testimony "solely for impeachment."[20] *See* Utah R. Civ. P. 26(a)(4)(A) (2010) (stating that prior to trial, "[a] party shall provide to other parties" the contact information "of each witness" unless the witness's testimony will be used "*solely for impeachment*") (emphasis added). But the rule Robertson cites is inapposite.

---

20. On November 1, 2011, after Far West had filed this action against Robertson but before the case went to trial, the Utah Supreme Court amended rules 26 and 37 of the Utah Rules of Civil Procedure. The advisory committee notes explain that "the Supreme Court order adopting the 2011 amendments makes them effective only as to cases filed on or after the [November 1] effective date." Utah R. Civ. P. 1 advisory committee notes. Thus, while the rule had been amended by the time of trial, the parties remained bound by the unamended rules, and it is the unamended rules that we apply here.

¶52 At trial, the court invited Robertson to explain on the record "why [he] couldn't have disclosed this witness" prior to trial. Robertson responded that he had "only hired [the witness] to refute the exhibit that [he] received 30 days ago on the . . . appraisal" that Far West's expert had provided. Continuing, he explained,

> I hired her at that time . . . to look [at the] subject propert[y], to find properties that had sold in that time frame [when the subject property was sold] and to rebut [Far West's] . . . claims on . . . the appraisal that I felt . . . under-valued [the property] and . . . did not produce adequate properties as comparables . . . and failed to take into consideration properties that were available on . . . the Wasatch Front or close . . . properties that had sold in a relativel[y contemporaneous] period of time.

In short, Robertson informed the court that his witness is in the business of appraising property and that she would offer opinions on the value of the Property to rebut the contrary opinions of Far West's expert.

¶53 Given Robertson's representations to the district court, we conclude that the rule governing whether Robertson was required to disclose his witness prior to trial was not rule 26(a)(4)(A), as he maintains, but rule 26(a)(3). The latter rule provided that "[a] party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Utah Rules of Evidence." Utah R. Civ. P. 26(a)(3)(A) (2010). Specifically, rule 702 governed the admissibility of testimony from a witness "qualified as an expert" whose "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). Under then rule 26(a)(3), such evidence must be disclosed

prior to trial even "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another" party's expert report. Utah R. Civ. P. 26(a)(3) (2010).

¶54   Accordingly, since Robertson informed the district court that he intended to rebut the testimony of Far West's expert with testimony from a witness with "scientific, technical, or other specialized knowledge," his witness should properly have been disclosed prior to trial. *See id.* R. 37(f) ("If a party fails to disclose a witness . . . as required by Rule 26(a) . . . , that party shall not be permitted to use the witness[.]"). We therefore conclude that the court did not err in excluding the testimony of Robertson's appraiser.

## IV. Attorney Fees on Appeal

¶55   Finally, pursuant to rule 24(a)(9) of the Utah Rules of Appellate Procedure, Far West requests an award of the reasonable attorney fees it incurred on appeal. "[A] provision for payment of attorney's fees in a contract includes attorney's fees incurred by the prevailing party on appeal as well as at trial, if the action is brought to enforce the contract[.]" *Management Services Corp. v. Development Assocs.*, 617 P.2d 406, 409 (Utah 1980). Moreover, the Consolidated Loan Agreement expressly provides that appellate attorney fees are recoverable in addition to those incurred at the trial level. Attorney fees were awarded to Far West at the trial level, and Far West has prevailed on appeal. It follows that Far West is entitled to an award of its attorney fees reasonably incurred on appeal. *See id.*

## CONCLUSION

¶56   Having concluded that the district court did not err in dismissing Robertson's counterclaims on summary judgment, in granting partial summary judgment in Far West's favor, or in excluding the testimony of Robertson's appraiser at trial, we conclude that the court's judgment should be affirmed. Further,

we grant Far West's request for an award of reasonable attorney fees incurred on appeal and remand for the limited purpose of calculating that award.

───────────